Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/09/2020 09:08 AM CDT

Naomi Amulo Lasu, appellee, v.
Emmanuel M'Baya Lasu,
appellant.

___ N.W.2d ___

Filed June 9, 2020.    No. A-19-155.

1. **Judgments: Jurisdiction: Appeal and Error.** A jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision.
2. **Divorce: Child Custody: Child Support: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody and child support.
3. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. However, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.
4. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
5. **Jurisdiction: Words and Phrases.** Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved.
6. **Jurisdiction.** Parties cannot confer subject matter jurisdiction upon a judicial tribunal by either acquiescence or consent, nor may subject

matter jurisdiction be created by waiver, estoppel, consent, or conduct of the parties.

7. ____. A lack of subject matter jurisdiction may be raised at any time by any party or by the court sua sponte.

8. **Judgments: Jurisdiction.** A ruling made in the absence of subject matter jurisdiction is a nullity.

9. **Divorce: Domicile: Time: Words and Phrases.** The language of Neb. Rev. Stat. § 42-349 (Reissue 2016) requiring an "actual residence in this state" means that one party is required to have a bona fide domicile in Nebraska for 1 year before commencement of a dissolution action.

10. **Domicile: Intent: Words and Phrases.** Domicile is obtained only through a person's physical presence accompanied by the present intention to remain indefinitely at a location or site or by the present intention to make a location or site the person's permanent or fixed home.

11. **Domicile: Intent.** The absence of either presence or intention thwarts the establishment of domicile.

12. ____ : ____. In order to effect a change of domicile, there must not only be a change of residence, but an intention to permanently abandon the former home. The mere residing at a different place, although evidence of a change, is, however long continued, per se insufficient.

13. **Domicile.** Once established, domicile continues until a new domicile is perfected.

14. ____. One spouse may have a domicile separate from the other.

15. **Domicile: Intent.** A brief move to another location to see if living with one's spouse will succeed may not indicate present intent to change one's domicile.

16. **Jurisdiction: Words and Phrases.** Personal jurisdiction is the power of a tribunal to subject and bind a particular entity to its decisions.

17. **Jurisdiction: Waiver.** Lack of personal jurisdiction may be waived and such jurisdiction conferred by the conduct of the parties.

18. **Jurisdiction: Pleadings: Parties.** A party will be deemed to have appeared generally if, by motion or other form of application to the court, he or she seeks to bring its powers into action on any matter other than the question of jurisdiction over that party.

19. ____ : ____ : ____. A party who files an answer generally denying the allegations of a petition invokes the court's power on an issue other than personal jurisdiction and confers on the court personal jurisdiction.

20. **Actions: Stipulations.** Parties are bound by stipulations that are voluntarily made, and relief from such stipulations is warranted only under exceptional circumstances.

21. **Child Custody.** When deciding custody issues, the court's paramount concern is the child's best interests.

22. **Child Support: Rules of the Supreme Court.** In general, child support payments should be set according to the Nebraska Child Support Guidelines.

23. \_\_\_\_: \_\_\_\_. A deviation in the amount of child support is allowed whenever the application of the Nebraska Child Support Guidelines in an individual case would be unjust or inappropriate.

24. \_\_\_\_: \_\_\_\_. Deviations from the Nebraska Child Support Guidelines must take into consideration the best interests of the child or children.

25. **Child Support.** Only reasonable transportation expenses may reduce or abate a child support obligation.

26. \_\_\_\_. Allowing unlimited abatement of child support, to the point where the custodial parent receives substantially reduced or no child support, is contrary to the children's best interests.

Appeal from the District Court for Lancaster County: ROBERT R. OTTE, Judge. Affirmed.

Steffanie J. Garner Kotik, of Kotik & McClure Law, for appellant.

John D. Rouse for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Emmanuel M'Baya Lasu appeals from the decree entered by the Lancaster County District Court dissolving his marriage to Naomi Amulo Lasu, awarding legal and physical custody of the parties' child to Naomi, and ordering Emmanuel to pay child support. Emmanuel claims the district court lacked subject matter and personal jurisdiction. He also disputes the custody and child support orders. We affirm.

## II. BACKGROUND

In November 2015, Emmanuel and Naomi had a child, Jacob Lasu, out of wedlock. At that time and throughout her pregnancy, Naomi lived in Lincoln, Nebraska, her place of residence for many years. Emmanuel has lived solely in California at all times relevant to this case. According to

Naomi, from Jacob's birth until December 2016, Emmanuel saw Jacob only three times. Naomi continued to live with Jacob in Lincoln until sometime in December 2016. Then, for about 3 months, from December 2016 to March 2017, Naomi and Jacob lived in Emmanuel's home in California. Naomi explained that she went to California because it was best for Jacob "to have both parents around him." Emmanuel and Naomi wed on December 29, 2016, in California. Shortly thereafter, they began to experience difficulties in their marriage. Following an argument between the parties in March 2017, the facts of which are contested, Naomi returned to Nebraska with Jacob.

Naomi described the circumstances of the argument as follows: Emmanuel had been drinking alcohol that night; alcohol was one of the "major issues" in their marriage. At some point, Jacob was standing on a table and Emmanuel proceeded to move the table after Naomi told him to have Jacob "step down" first. Jacob was not hurt; however, the argument escalated to where Emmanuel was "screaming" at her and calling her "name[s]." He asked her to "get out of his house." Emmanuel was holding a firearm and moving around the house. Naomi was intimidated and feared she might be shot. Naomi left the house and contacted her sister, who called the police. After the police arrived, Naomi left the house with Jacob. She took some physical possessions; Emmanuel had thrown her belongings and some of Jacob's belongings outside a bedroom. She and Jacob stayed at a hotel for a couple days, after which she and Jacob left California and returned to Lincoln.

Emmanuel described the incident differently. He claimed that on March 18, 2017, he and Naomi were arguing about a party that was supposed to have taken place for Naomi in Nebraska before her move to California. Although he had an alcoholic drink at 2 p.m. that day, Emmanuel denied drinking that night. He never called Naomi "names." He said Naomi's story about the table was inaccurate. He claimed he would lift Jacob off the table and put him on the floor, but then Jacob

started running and fell on the carpet. Emmanuel acknowledged having a firearm, for which he had a license, but he denied he was carrying it around the house during the argument. It was "locked up in a safe" in his home office.

In the morning on March 19, 2017, Naomi was packing. Emmanuel did not want to "aggravate the situation," so he left around 9 a.m. and came back around noon. Naomi was still packing. Jacob was sleeping downstairs. Emmanuel took him upstairs, and they napped. Naomi awakened Jacob and took him downstairs around 2 p.m. Police arrived 10 minutes later. Emmanuel said he told the police he was not drunk. After a "reasonable conversation," the police believed him. On Emmanuel's direction, the police opened his safe to find a "dusty" unloaded gun. He said the police believed he had not touched the gun the night before. They did not take it away. He was not cited or arrested. Naomi left his house that day.

Emmanuel did not go to work on March 20, 2017, so he could "process" life. Naomi returned to his house and continued packing. She was there for about 30 to 45 minutes before leaving. He denied that he ever threw any of her belongings out of any rooms into the hall. Nor did he ever tell her that she needed to move out of his house. He thought she had at first gone to a hotel and had sent her text messages to come stay at his house. He was not aware of when Naomi left with Jacob for Lincoln. Emmanuel stated that he continued to text Naomi about where she was and that she had said she was in California. Later, a sheriff served him a "letter for domestic violence" filed in Nebraska, dated March 24, 2017. (Naomi testified she filed for a restraining order in Nebraska.) According to Emmanuel, that was the first time he knew Naomi went to Lincoln.

On April 5, 2017, Naomi filed a complaint in the district court seeking the dissolution of her marriage. She alleged that she had been a Nebraska resident for more than 1 year prior to filing and that she maintained a residence in Lincoln, Nebraska. She sought temporary and permanent custody of

Jacob, subject to Emmanuel's reasonable parenting time. On June 6, Naomi filed an amended complaint substantially similar to her complaint. Emmanuel was personally served in California on July 25. On August 22, Emmanuel filed a motion to dismiss the case for lack of subject matter and personal jurisdiction. As to subject matter jurisdiction, Emmanuel disputed that Naomi had lived in Nebraska for 1 year before filing her initial complaint for dissolution of marriage. Emmanuel argued that he had never resided in Nebraska and that Jacob had not lived in Nebraska for 4 months at the time Naomi filed her initial complaint. Regarding personal jurisdiction, Emmanuel alleged that he had lived in California during the parties' marriage and had been served there.

On September 15, 2017, there was a joint teleconference hearing before the district court and a California court related to Emmanuel's motion to dismiss and Naomi's motion to stay or dismiss a dissolution and custody action that Emmanuel had filed in July in California. Each party had an attorney representing his/her interests both in Nebraska and California. The California court found that Jacob never lived in California for more than 6 months as required for it to acquire jurisdiction over custody matters. It was prepared to decline jurisdiction altogether if the Nebraska court saw it fit to assert jurisdiction over child custody issues. The district court determined it could exercise jurisdiction over the parties and custody and dissolution matters. The district court noted that Naomi moved to California with "some intent" but it "didn't work out." Naomi was in Nebraska "for a period" before she went to California and the "three-month period [in California] gets tacked onto that, essentially, so she can show a six-month period here." During the telephonic hearing, Emmanuel personally agreed to litigate the marriage dissolution in Nebraska given that custody was to be litigated here. The same day, the district court entered an order overruling Emmanuel's motion to dismiss and noting the California case would be dismissed. On September 28, the district court entered an order in which

it stated its reasoning for finding jurisdiction over custody issues, namely that Jacob resided in Nebraska for 6 consecutive months or more but lived in California for only 3 months. It also noted that the parties "stipulated that the divorce proceeding should also be heard in Nebraska."

On October 12, 2017, Emmanuel filed an answer to Naomi's amended complaint, admitting that she had been a resident of Nebraska for more than 1 year prior to filing her amended complaint, but denying the other material allegations. In the same filing, Emmanuel included a "cross-complaint," which sought dissolution of the parties' marriage and custody of Jacob.

Trial took place on December 17, 2018. Each party testified, and their exhibits were admitted into evidence. In addition to the evidence already set forth above, we will discuss other evidence in our analysis where relevant to the issues on appeal. At the end of trial, the district court granted Emmanuel 10 days of parenting time over Jacob's Christmas break. The other issues relevant to this appeal were taken under advisement.

On January 14, 2019, the district court entered a decree dissolving the parties' marriage. Naomi was awarded legal and physical custody of Jacob, subject to Emmanuel's parenting time in accordance with a parenting plan attached to the decree. Emmanuel was to receive extended periods of parenting time during Jacob's summer and spring school breaks, as well as half of Jacob's Christmas break. Each party was allowed reasonable telephone contact with Jacob every other day. Emmanuel was to accompany Jacob in both directions of travel in the exercise of his parenting time until further order. Emmanuel was responsible for transportation costs associated with his parenting time in consideration of a reduction in child support. Child support without a reduction was calculated to be $927 per month. With a deviation for transportation costs, the district court ordered child support of $600 per month beginning January 1. The parties would equally split any childcare expenses incurred by Naomi to allow her to maintain

employment or attend school. Generally, the parties would alternate entitlement to claim Jacob as a dependent each year. Naomi was to maintain health insurance for Jacob provided it was available to her through work at a reasonable cost; uncovered medical costs for Jacob were to be split equally by the parties after Naomi's payment of $480 per year.

Emmanuel appeals.

## III. ASSIGNMENTS OF ERROR

Emmanuel claims, restated, that the district court erred by (1) failing to dismiss this case for lack of subject matter and personal jurisdiction, (2) awarding Naomi sole legal and physical custody of Jacob, and (3) not using a joint custody calculation to determine his child support obligation and not applying a greater downward deviation for his travel expenses.

## IV. STANDARD OF REVIEW

[1] A jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision. *Green v. Seiffert*, 304 Neb. 212, 933 N.W.2d 590 (2019).

[2-4] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). This standard of review applies to the trial court's determinations regarding custody and child support. See *id.* In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id.* However, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly

depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. Jurisdiction

#### (a) Subject Matter Jurisdiction

Emmanuel does not dispute the district court's subject matter jurisdiction over the child custody matters. He claims the district court lacked subject matter jurisdiction over the marriage dissolution.

[5-8] Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved. *Boyd v. Cook*, 298 Neb. 819, 906 N.W.2d 31 (2018). Parties cannot confer subject matter jurisdiction upon a judicial tribunal by either acquiescence or consent, nor may subject matter jurisdiction be created by waiver, estoppel, consent, or conduct of the parties. *Id.* A lack of subject matter jurisdiction may be raised at any time by any party or by the court sua sponte. *Id.* A ruling made in the absence of subject matter jurisdiction is a nullity. *Spady v. Spady*, 284 Neb. 885, 824 N.W.2d 366 (2012).

Although Emmanuel personally stipulated during the September 15, 2017, telephonic hearing between the parties and the California and Nebraska courts that the district court had jurisdiction over the marriage dissolution action, subject matter jurisdiction cannot be waived by or consented to by the parties, and can be raised at any time. See *Boyd v. Cook, supra*. We therefore consider Emmanuel's argument that Naomi did not live in Nebraska for 1 year prior to filing the complaint, Emmanuel had never resided in Nebraska, and Naomi and Jacob "moved to California with a bona fide intention of making California their permanent home." Brief for appellant at 21. He contends Naomi "essentially gave up her residency in Nebraska" with the intent to make California her permanent home, as shown by "being placed on health insurance

in California that would only work [there], registering her vehicle in California, and obtaining insurance for the vehicle in California." *Id.* at 20.

[9-13] Pursuant to Neb. Rev. Stat. § 42-349 (Reissue 2016), in order to maintain an action for divorce in Nebraska, one of the parties must have "had actual residence in this state with a bona fide intention of making this state his or her permanent home for at least one year prior to the filing of the complaint." The Nebraska Supreme Court has interpreted the language of § 42-349 requiring an "actual residence in this state" to mean that one party is required to have a "'bona fide domicile'" in Nebraska for 1 year before commencement of a dissolution action. See *Huffman v. Huffman*, 232 Neb. 742, 748, 441 N.W.2d 899, 904 (1989). Domicile is obtained only through a person's physical presence accompanied by the present intention to remain indefinitely at a location or site or by the present intention to make a location or site the person's permanent or fixed home. *Id*. The absence of either presence or intention thwarts the establishment of domicile. See *id*. See, also, *Gosney v. Department of Public Welfare*, 206 Neb. 137, 291 N.W.2d 708 (1980) (mere residing at different place, however long, is per se insufficient to establish new domicile; there must also be intent to permanently abandon former home). Once established, domicile continues until a new domicile is perfected. *Metzler v. Metzler*, 25 Neb. App. 757, 913 N.W.2d 733 (2018).

In some cases, persons with significant physical absences from Nebraska in the year preceding a petition for dissolution may qualify as Nebraska domiciliaries for jurisdictional purposes. In *Rector v. Rector*, 224 Neb. 800, 401 N.W.2d 167 (1987), jurisdiction in Nebraska was established where a truckdriver who spent the majority of his time driving across the country was raised in North Platte, Nebraska; considered it his home; did his banking there; and testified to several years of residence before filing a petition for divorce. In *Catlett v. Catlett*, 23 Neb. App. 136, 869 N.W.2d 368 (2015), jurisdiction

was established where a contractor for a Kuwait company, who spent 36 days in the United States in 2012, filed for divorce in Nemaha County, Nebraska, in June 2013. The contractor had a home in Nemaha County since 2009, and he used that address for several official purposes. He also held a bank account there, and he pled, testified, and represented to the court his intent to make Nebraska his permanent or fixed home more than 1 year prior to the divorce filing.

[14] Further, one spouse may have a domicile separate from the other. *Dilsaver v. Pollard*, 191 Neb. 241, 214 N.W.2d 478 (1974). For example, in *Wray v. Wray*, 149 Neb. 376, 31 N.W.2d 228 (1948), the parties wed in Grand Island, Nebraska (wife's residence of many years), in July 1945, then stayed at the wife's mother's home for 2 days before the husband's deployment overseas. Upon the husband's discharge from the armed services, he went to Virginia and never returned to Nebraska. The wife bought a roundtrip ticket to Virginia with the purpose of taking up life with the husband as his wife. She testified that she did not go there to establish a Virginia residency. She stayed in Virginia from January 21 to February 14, 1946, then returned to and remained in Grand Island. The Nebraska Supreme Court held that the wife was continuously a Nebraska resident from and for a long time before the marriage until the hearing on the petition for divorce. It rejected the notion that the wife surrendered her Nebraska residency at the time of the marriage or at any time between then and the date of trial. Jurisdiction over the divorce was found to exist.

In the present case, Naomi testified that she had lived in Lincoln for 10 years before she went to California. She lived in California for a period of only about 3 months before moving back to Lincoln with Jacob. About 1 month passed from the time she returned to Lincoln to the time she filed her initial complaint, and about 3 months passed from her return to the time she filed her amended complaint. Notably, even Emmanuel admitted in his answer that Naomi had been

a Nebraska resident for more than 1 year prior to her filing her amended complaint. There is no doubt Naomi was domiciled in Nebraska before her move to California. The question is whether she remained domiciled in Nebraska despite her brief move to California, or whether she had a present intent to make California her permanent or fixed home as of December 2016.

Naomi testified that it was Emmanuel's "plan" to bring her to California. She denied that she had decided she was going to get married at the time she left for California. Instead, she wanted to go there because she thought it best for Jacob to have both parents around. Emmanuel concedes that was her intent. She said that when she got to California, Emmanuel began talking about getting a marriage license for beneficial tax purposes. She felt "rushed." Emmanuel asserted they were already "[t]raditionally" married before Naomi's move based upon his payment of a dowry to her family, but he agreed they were not yet legally married. The parties were married in California soon after Naomi's arrival. According to both parties, Emmanuel had paid for Naomi's and Jacob's one-way flight there. Emmanuel said that he opened a credit card to facilitate moving Naomi and her belongings and that they had talked about how they would move her items, including her car. The record does not show what amount of Naomi's belongings were actually moved.

Naomi had quit her job at a manufacturing company in Nebraska to move to California, but she did not get a job while in California. Emmanuel had recommended she apply for certain jobs or enroll in a school program, but she refused. According to Emmanuel, Naomi's name was never put on his California home. Naomi was covered by Emmanuel's health insurance beginning February 1, 2017, and both parties testified that Emmanuel's health insurance is unusable in Nebraska. While Emmanuel argues that Naomi had registered and obtained insurance for her vehicle in California, there is no evidence in our record about that; counsel's

statements about the same during the joint hearing are irrelevant. See *In re Guardianship & Conservatorship of Alice H.*, 303 Neb. 235, 927 N.W.2d 787 (2019) (counsel's arguments are not evidence). After the parties' argument in March 2017, Naomi drove back to Nebraska with Jacob; it was a one-way trip.

Testimony as to one's own intent regarding his or her domicile, although subjective, is entitled to great weight in domicile determinations. See, *State ex rel. Rittenhouse v. Newman*, 189 Neb. 657, 204 N.W.2d 372 (1973); *Catlett v. Catlett*, 23 Neb. App. 136, 869 N.W.2d 368 (2015) (husband formed intent to make Nebraska his fixed home more than 1 year before divorce petition was filed; among other things, husband who worked overseas admitted in pleadings that for more than 1 year he held bona fide intent of making Nebraska his home and residence and listed Nebraska home as mailing address in pleadings).

[15] Emmanuel and Naomi were not legally married at the time of her California move. She had continued to live without Emmanuel in Nebraska after Jacob's birth, apparently without issue or complaint, for slightly over a year before moving. Naomi had never lived with Emmanuel before her move. By the time she headed to California, she had lived in Nebraska for 10 years. Naomi clearly discovered within a relatively short time that she disagreed with Emmanuel's lifestyle; she stopped living with him by March 2017. Affording due weight to Naomi's testimony and considering the other relevant parts of the record, we find that Naomi moved to California to determine if jointly raising Jacob with Emmanuel would be agreeable. See *Wray v. Wray*, 149 Neb. 376, 31 N.W.2d 228 (1948) (brief move to another location to see if living with spouse will succeed may not indicate present intent to change one's domicile). Upon leaving California, Naomi immediately returned to Lincoln. Naomi had extended family in Lincoln and Omaha, Nebraska. Moreover, she consistently represented to the district court in her filings that she had been a Nebraska

resident for more than 1 year prior to her filings for dissolution and that she maintained a residence in Lincoln.

The record does not establish that Naomi intended to abandon her home in Nebraska when she moved to California from December 2016 to March 2017. She had resided in Nebraska for a decade before that and immediately returned to Nebraska after being in California for only a few months. Therefore, Naomi remained domiciled in Nebraska for more than 1 year before filing for dissolution. See *Huffman v. Huffman*, 232 Neb. 742, 441 N.W.2d 899 (1989). The district court had subject matter jurisdiction over the dissolution pursuant to § 42-349.

### (b) Personal Jurisdiction

[16,17] Emmanuel claims the district court lacked personal jurisdiction over him, in part, because he was personally served in California and his first responsive pleading was a motion to dismiss (alleging lack of jurisdiction). Personal jurisdiction is the power of a tribunal to subject and bind a particular entity to its decisions. *J.S. v. Grand Island Public Schools*, 297 Neb. 347, 899 N.W.2d 893 (2017). Lack of personal jurisdiction may be waived and such jurisdiction conferred by the conduct of the parties. *Hunt v. Trackwell*, 262 Neb. 688, 635 N.W.2d 106 (2001).

[18,19] Notably, after the district court overruled Emmanuel's motion to dismiss, he filed an answer that included a counterclaim, which he entitled a "cross-complaint," for an array of affirmative relief from the district court. In doing so, he waived an objection to personal jurisdiction over him. See, Neb. Rev. Stat. § 25-516.01(2)(a) (Reissue 2016) (if defense of lack of jurisdiction over person is asserted either by motion or in responsive pleading and court overrules defense, objection that court erred in its ruling will be waived and not preserved for appellate review if party asserting defense thereafter files demand for affirmative relief by way of counterclaim); *Applied Underwriters v. Oceanside Laundry*, 300

Neb. 333, 912 N.W.2d 912 (2018) (party will be deemed to have appeared generally if, by motion or other form of application to court, he or she seeks to bring its powers into action on any matter other than question of jurisdiction over that party); *Hunt v. Trackwell, supra* (party who files answer generally denying allegations of petition invokes court's power on issue other than personal jurisdiction and confers on court personal jurisdiction).

[20] We also note that Emmanuel appeared to have waived a personal jurisdiction defense even before he filed his answer and counterclaim. During the joint hearing between the California and Nebraska courts, he personally agreed to litigate the dissolution action in Nebraska, which necessitated that the district court had personal jurisdiction over him. See *Shearer v. Shearer*, 270 Neb. 178, 700 N.W.2d 580 (2005) (parties are bound by stipulations that are voluntarily made, and relief from such stipulations is warranted only under exceptional circumstances).

Emmanuel's objection to personal jurisdiction was waived by his own actions, as noted.

## 2. Legal and Physical Custody

Emmanuel claims that instead of awarding Naomi full custody of Jacob, the district court should have awarded the parties joint legal and physical custody.

### (a) Relevant Facts

Jacob lived with Naomi in Nebraska from his birth in November 2015 until December 2016. Naomi testified that Emmanuel was not present for Jacob's birth but "came the day after." Emmanuel saw Jacob just three times, for a 4- or 5-day duration, between the day of Jacob's birth and the time Naomi moved with Jacob to California. The only time Emmanuel has lived with Jacob was from December 2016 to March 2017, when Naomi and Jacob lived with him in California. And after Naomi returned to Nebraska in March, Emmanuel exercised no parenting time with Jacob until October 2018. Trial

took place a couple months after that. Therefore, by the time Jacob was 3 years old, other than the few months the family had lived together in California, Emmanuel's actual parenting time with Jacob consisted of less than a handful of 4-to-5-day parenting periods.

### (i) California From December 2016 to March 2017

Regarding her time living in California, Naomi testified that Emmanuel was not home from around 7 or 7:15 a.m. until about 5:30 or 6 p.m. on days that he worked, Monday through Friday and some Saturdays. Further, Emmanuel did not spend a lot of time with her and Jacob after work. Naomi estimated that about three or four times a week, Emmanuel would come home and then go to the gym and not come back until "10:30 or 11, midnight sometimes." By that time, Naomi and Jacob would be in bed. Other nights, Emmanuel would be "drinking [alcohol] and watching TV." Naomi said it was fair to say she did the majority of parenting when she and Emmanuel were living together. Emmanuel "was not there most of the time." She handled Jacob's baths, tended to Jacob during the night, changed Jacob's diapers, and put Jacob to bed. However, she indicated that if Emmanuel was home on the weekends, he bathed Jacob, and he changed diapers on occasion, too.

Emmanuel said that he worked as an accountant for the State of California and that he could work from home if needed. He would normally go to the gym for an hour or jog around the neighborhood maybe once or twice a week after work. He normally spent time with Jacob after work, reading him a book or watching "Mickey Mouse" together, and had him go to sleep around 9 to 10:30 p.m. Emmanuel said Naomi would continue to watch television until midnight. Emmanuel said that on the weekends, he gave Jacob milk and fed him, changed his diapers, gave him baths, and went to the park and watched television with him.

Naomi said Emmanuel would "drink about a bottle [of wine] at a time to a bottle and a half." When he drank, he was angry and "not himself" and would try to fight with her and call her "name[s]"; a couple times he "question[ed] the paternity of Jacob." According to Naomi, Emmanuel drank to the point of intoxication every time he drank. She believed he was verbally and mentally abusive (e.g., Emmanuel held a firearm during the March 2017 incident).

Emmanuel did not believe he had an alcohol problem. As of trial, he said he did not have alcohol in his home. He would follow any court order that he not drink alcohol during his time with Jacob. Emmanuel said he never consumes alcohol in the presence of his children; Emmanuel has another son, age 8 at the time of trial, from a prior relationship. Naomi offered two photographs into evidence depicting Emmanuel with his other son on different days. The photographs show a full or partial view of a wine glass near Emmanuel containing a dark-colored liquid, which Emmanuel claimed was grape juice.

Emmanuel testified that during the time Naomi was with him in California, he never removed his gun from the safe. Although both parties indicated that police responded to the incident in March 2017, Emmanuel said he was not cited or arrested. Naomi did not know if he received a citation. While Naomi said she had filed for a restraining order in Nebraska (Emmanuel indicated the same), there was no evidence that one had been entered against Emmanuel for the protection of Naomi and/or Jacob. Emmanuel called Naomi's domestic violence filing "false." He denied being physically or emotionally abusive to Naomi, and he denied having an anger problem.

Naomi offered a photograph of Emmanuel holding a gun with the barrel pointed toward the top of his head. Emmanuel identified himself in the photograph. He explained that in September 2017, he had placed that picture on the internet, but the photograph was taken in December 2016. He did not

know it at the time, but his friend took the picture of him after they had gone to the shooting range and were cleaning their guns. The picture "went to Facebook" "involuntarily." When people contacted him about the picture, saying it was "really bad," he took the picture down. He was "stressed out" about the parties' separation, but did not ever attempt suicide. Emmanuel claimed the photograph was taken before Naomi and Jacob lived in his home.

### (ii) Nebraska From March 2017
### to December 2018

According to Naomi, since her return to Nebraska in March 2017, Emmanuel had not spent time with Jacob until over 1½ years later when he came and picked up Jacob for a visit in Kansas City, Missouri, in October 2018. Emmanuel also acknowledged this. Emmanuel said he flew to Kansas City, drove to Lincoln to pick up Jacob, and then spent 5 days in Kansas City with him. Emmanuel's brother, who lives in Kansas City, and his three children, along with Emmanuel's father and sister, were present during that time. Emmanuel described Jacob's demeanor at that time as "very happy." Emmanuel was "so surprised" when Jacob knew who he was when they first saw each other.

Naomi indicated that Emmanuel asked her for parenting time via text messages "maybe twice" during the large time gap from March 2017 to October 2018. Naomi objected to the requests to the extent Emmanuel was requesting parenting time to take place outside of Nebraska. She told Emmanuel he could "come visit" in Nebraska because this case was still pending. There was no custody order in place yet. She sought temporary custody at the time she let Jacob go with Emmanuel in October. After that, Emmanuel requested parenting time over Thanksgiving break, which would have been "two weeks" later. Emmanuel wanted to pick up Jacob and take him back to California. Naomi did not agree to it. However, as of trial, she was willing to let Emmanuel have

parenting time over the upcoming Christmas holiday because she had Jacob over Thanksgiving. She agreed it would be appropriate for Emmanuel to take Jacob with him to California after the trial to avoid the need for Emmanuel to make a separate trip to exercise that parenting time. She was agreeable to alternating holiday parenting time, and she also agreed that Emmanuel could come to Nebraska nearly any time he wanted to see Jacob.

Emmanuel stated that he never had a "video chat" with Jacob. He had asked to do so "several times" by text messaging Naomi, which he claimed was how Naomi had asked him to communicate with her. Emmanuel remembered sending Naomi 7 to 10 text messages during different months about wanting to "come and see" Jacob. Naomi "would say that [he] can come and spend time with Jacob here in Lincoln." Emmanuel indicated that was not easy for him because coming to Lincoln meant he would have to rent a car and hotel. Also, he was unfamiliar with Lincoln and did not know where to take Jacob. He wanted Jacob with him in California so Jacob could feel that Emmanuel's home, a "five-bedroom house," was his, too. Emmanuel recalled that after his requests were not successful, he got the court involved in October 2018. Emmanuel came to Lincoln for trial 4 days ahead of time but had not had time with Jacob. He admitted, however, that he had not told Naomi he was in town.

Before moving to California, Naomi had worked at a manufacturing company. At the time of trial, Naomi worked full time as a nurse's aide at a hospital in Lincoln. Naomi has a large extended family in Lincoln and Omaha. Naomi arranges for Jacob to go to daycare at a family member's house during the time she works. She also had Jacob enrolled in preschool. Naomi described Jacob as being in good health and having a pediatrician and a dentist. Emmanuel said Naomi had never given him any information regarding doctor appointments for Jacob or about the identity of his doctors; he learned of the pediatrician by seeing a letter during a prior hearing.

Naomi started Jacob in the "Head Start" program at a pub-
lic preschool that he attended 3 hours per schoolday. He was
doing "amazing" and loved school. Naomi noted that because
Jacob was "delayed in speech," he was working with a speech
therapist Monday through Friday. Naomi was concerned that
if Jacob left Lincoln, he would not receive help with his
speech. Jacob had an individualized education plan, and there
were meetings regarding it. Naomi had communicated with
Emmanuel about Jacob's need to be, in Emmanuel's counsel's
words, "screened." Although she denied telling Emmanuel
when meetings were, she asserted that he did not show "any
interest" when she "followed up." She denied giving him any
information herself; however, she thought the "coordinator"
called Emmanuel one time. She acknowledged that Emmanuel
had communicated concerns to her about Jacob's speech after
a visit with him.

Emmanuel said "someone" from "Lincoln Public School[s]"
called him up to 6 months before trial and told him that Jacob
was in a speech improvement program through preschool. He
said he requested monthly updates to track Jacob's progress.
He said he did not learn any information concerning Jacob's
speech from Naomi. He would ask Naomi "several times"
about how Jacob was doing, but she would not respond or
sometimes would just respond with "fine" in text messages.
But he agreed it was possible that Naomi provided the public
school caller with his contact information.

Emmanuel did not have any family members in Nebraska
other than some cousins who lived in Omaha. Emmanuel
lived in his California home with his own father and occa-
sionally with his other son. Emmanuel's other son was not
present when Naomi and Jacob lived in California. According
to Emmanuel, he had joint legal and physical custody of his
other son, whose mother lived in Missouri. Emmanuel had
homeschooled his other son since 2013, which consisted of 1½
to 2 hours of class after Emmanuel came home from work and
they had dinner; Emmanuel's father also helped with teaching

on weekends. Emmanuel thought homeschooling Jacob would be "amazing" and appropriate. However, he was not against putting Jacob in a public school if he were to have custody of him. He indicated a school near his home was one of the "better" schools in northern California. Emmanuel offered exhibits of photographs of the exterior and interior of his home, as well as photographs of himself and other family members with Jacob and/or his other son.

### (b) District Court's Ruling

At the end of trial, the district court stated that it was concerned about the lack of parenting time that Emmanuel had over the course of time. "[E]ven taking him at his word about contacting [Naomi] and some of those other things, quite frankly, the file is pretty barren of [his] attempt to secure reasonable parenting time over the course of the last year and a half." While understanding there was some difficulty with regard to Naomi's move to California and then her return to Nebraska, "putting that aside," the district court was concerned there had been "so little parenting time." Because Naomi was not resistant to it, the district court orally granted Emmanuel 10 days of parenting time over Jacob's Christmas break in 2018. However, the district court wanted Emmanuel to have some opportunity to see Jacob between trial (December 17) and the time he was to leave Nebraska (December 19) in Naomi's presence to make sure Naomi could "see that interaction." The district court added that it wanted a provision in the decree ordering "no guns outside of the gun safe at any time while [Jacob] is there" and no "drinking," "alcohol use," "illegal drug use," or "drug use of any kind except by prescription."

In the decree, the district court found Naomi was a fit and proper person to have custody of Jacob. It noted that custody and parenting time issues were "always difficult in circumstances such as these." The parenting plan reiterated that Naomi was awarded the primary legal and physical

custody of Jacob. She had the "authority to make final decisions concerning the parental functions necessary for raising [Jacob]," including his education, religious upbringing, medical needs, and extracurricular activities. Additionally, the parenting plan stated that neither party was to consume alcohol or drugs to the point of intoxication when Jacob was in his or her custody.

#### (c) Applicable Law

Under the Parenting Act, Neb. Rev. Stat. §§ 43-2920 to 43-2943 (Reissue 2016 & Cum. Supp. 2018), the concept of child custody encompasses both "legal custody and physical custody." § 43-2922(7). "Legal custody" means the authority and responsibility for making fundamental decisions regarding the child's welfare, including choices regarding education and health. § 43-2922(13). "Physical custody" means authority and responsibility regarding the child's place of residence and the exertion of continuous parenting time for significant periods of time. § 43-2922(20).

[21] When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). Section 43-2923(6) states, in relevant part:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

. . . .

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

### (d) Did District Court Abuse Its Discretion?

Emmanuel argues that the district court did not determine child custody based on Jacob's best interests, apparently because he disagrees that an analysis of the relevant factors supports the custody ruling solely in Naomi's favor. He does not differentiate between legal and physical custody in his argument relating to the district court's decisions on custody. He contends that it would be in Jacob's best interests if the parties had joint custody.

### *(i) Legal Custody*

Concerning legal custody, Emmanuel contends that Naomi has "failed to provide [him] with any information regarding Jacob's health and education." Brief for appellant at 23. As described previously, legal custody focuses entirely on a parents' decisionmaking authority. See *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). The record indicates there was room for improvement as far as the quality and frequency of Naomi's communication with Emmanuel about Jacob's medical care and education. While Emmanuel expressed some frustration about that, he did not say he disagreed with any of Naomi's decisions regarding Jacob's medical care, education, religious upbringing, or activities. In fact, although Emmanuel thought homeschooling Jacob would have been appropriate, he did not disagree with Naomi's placement of Jacob in a public preschool. Further, his testimony showed he was supportive of Jacob's speech therapy.

Moreover, the record reflects that Naomi has been primarily responsible for Jacob's care since his birth and that she has been the primary decisionmaker regarding his welfare throughout his life. There is evidence the parties have not communicated well in the past, either in person or through text messaging. Importantly, Emmanuel did not believe that he and Naomi could put differences aside to make joint decisions about Jacob's best interests. And courts typically do not award joint legal custody when the parties are unable to communicate effectively. See, *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009) (joint decisionmaking by parents not in child's best interests when parents are unable to communicate face-to-face and there is level of distrust); *Klimek v. Klimek*, 18 Neb. App. 82, 775 N.W.2d 444 (2009) (no abuse of discretion by district court's failure to award joint custody when minor child was confused by temporary joint legal and physical custody arrangement and parents had hard time communicating with one another). We cannot conclude that awarding Naomi the primary legal custody of Jacob was an abuse of discretion.

### (ii) Physical Custody

The record generally shows that each party has a positive relationship with Jacob. However, as stated before, Jacob has lived primarily with Naomi since his birth. Emmanuel did not offer any compelling explanation for why he was largely absent from Jacob's life following Jacob's birth in November 2015 until trial in December 2018, with the exception of the few months Naomi and Jacob lived with him in California. Emmanuel did not testify as to requesting or being denied time with Jacob during that timeframe, other than sending 7 to 10 text messages to Naomi about taking Jacob to California which were denied by Naomi. However, other than his explanation regarding costs for renting a car and a hotel, or not knowing what to do in Lincoln, he did not reasonably explain why he did not make better efforts

to spend time with Jacob in Nebraska. Further, even when Naomi and Jacob lived with Emmanuel for about 3 months in California, Naomi still primarily took care of Jacob. Although there was some inconsistency in the parties' testimony about how much time Emmanuel spent at home with Jacob when he was not working, there is no question that Naomi maintained primary responsibility for Jacob's care during the brief stay in California.

The record supports that Naomi will be able to continue to provide for the general health, welfare, and social behavior of Jacob, including satisfying his physical, emotional, and educational needs, in a positive environment for his growth. We conclude the district court did not abuse its discretion in awarding Naomi the primary physical care of Jacob.

### 3. Child Support

Emmanuel claims the district court abused its discretion when it did not calculate child support "based off a joint custody child support calculation with a downward deviation due to the high travel expenses" he will incur to exercise his parenting time. Brief for appellant at 27. Because we previously determined that the district court did not abuse its discretion in awarding Naomi legal and physical custody of Jacob, we need not address Emmanuel's argument that child support should have been calculated as if the parties were awarded joint custody. However, Emmanuel claims in the alternative that the district court should have awarded a "larger deviation" on his child support obligation in light of his expected travel expenses. *Id.*

[22-24] In general, child support payments should be set according to the Nebraska Child Support Guidelines, which are applied as a rebuttable presumption. *Freeman v. Groskopf,* 286 Neb. 713, 838 N.W.2d 300 (2013); Neb. Ct. R. § 4-203 (rev. 2011). A deviation in the amount of child support is allowed whenever the application of the guidelines in an individual case would be unjust or inappropriate. *Pearson v.*

*Pearson*, 285 Neb. 686, 828 N.W.2d 760 (2013). Deviations from the guidelines must take into consideration the best interests of the child or children. *Id.*; § 4-203.

[25,26] Under Neb. Ct. R. § 4-210, any "documented substantial and reasonable long-distance transportation costs directly associated with . . . parenting time may be considered by the court and, if appropriate, allowed as a deviation from the guidelines." Only reasonable transportation expenses may reduce or abate a child support obligation. *Pearson v. Pearson, supra.* Allowing unlimited abatement of child support, to the point where the custodial parent receives substantially reduced or no child support, is contrary to the children's best interests. *Id.* A custodial parent has some fixed and constant expenses in raising children, and these expenses do not decrease during extended periods of parenting time with the noncustodial parent, or simply because transportation costs significantly increase. See *id.* A court should consider the impact of increased travel expenses on both parents in light of the best interests of the child. See *id.*

The child support calculation attached to the decree shows that Naomi's income is $2,234.26 per month ($26,811 per year) and that Emmanuel's income is $7,000 per month ($84,000 per year). Emmanuel's monthly child support obligation would have been $927 but for the deviation awarded under the decree for Emmanuel's "substantial additional expense to exercise parenting time." With a monthly deviation in the amount of $327 ($3,924 per year), Emmanuel's ordered child support obligation is $600 per month.

Emmanuel argues that in order to exercise three visits each year, a downward deviation of $550 per month (or $6,600 per year), which would reduce his child support obligation to $377 per month, should be awarded to allow him $2,200 per visit for two adult roundtrip flight tickets, one child roundtrip flight ticket, a rental car, and a hotel while in Nebraska. There was no clear documentation relating to travel expenses. The parties' testimony regarding estimated traveling expenses

varied significantly, especially in the amount of what it would cost for an airline ticket for Jacob.

Regardless, the deviation Emmanuel requests would substantially reduce child support owed to Naomi by over half the amount owed under the child support guidelines, despite the undisputed fact that Emmanuel's income is much greater than Naomi's income. Although Naomi testified that she would be agreeable to reducing child support from $927 to $500 to help with transportation costs (a $427 deviation), given the income disparity between the parties, we cannot say that the district court abused its discretion by limiting the deviation to $327 per month and ordering child support of $600 per month.

## VI. CONCLUSION

The district court's decree entered January 14, 2019, is affirmed in all respects.

Affirmed.