IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

GIES V. GIES

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

BRODY S. GIES, APPELLANT,

V.

CHELSEY D. GIES, APPELLEE.

Filed June 18, 2024.    No. A-23-792.

Appeal from the District Court for Scotts Bluff County: TRAVIS P. O'GORMAN, Judge. Affirmed.

Andrew W. Snyder, of Holyoke, Snyder, Longoria, Reichert & Rice, P.C., L.L.O., for appellant.

Sterling T. Huff, of Sterling T. Huff Attorney at Law, P.C., L.L.O., for appellee.

MOORE, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Brody S. Gies appeals from the decree of the Scotts Bluff County District Court dissolving his marriage to Chelsey D. Gies. He contends that the district court abused its discretion in failing to award the parties joint physical custody and in not utilizing a joint custody child support calculation. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Brody and Chelsey met in 2011 and were married in August 2012. The parties had three children together: Riggley D. Gies, born in 2013; Ebbet S. Gies, born in 2014; and Crosley M. Gies, born in 2016.

- 1 -

During the parties' marriage, both Chelsey and Brody drank alcohol with Chelsey abstaining while she was pregnant. In May 2016, Brody, while intoxicated, suffered a traumatic brain injury when he fell from a moving golf cart. After that injury, Brody abstained from alcohol for approximately 14 months but then resumed drinking. In 2019, the parties separated for a period of approximately 7 months during which time Chelsey and the children moved out of the marital home. During that period of time, Chelsey obtained a part-time job as a paralibrarian and she took care of the children. According to Chelsey, during those 7 months, the children were never alone in Brody's care and he never had them overnight. Thereafter, the parties reconciled, Chelsey and the children moved back into the marital residence, and Chelsey quit her job to resume being a stay-at-home parent. The parties purchased a new home located on approximately 6 acres with the closest neighbor approximately 1 mile away.

In April 2022, the parties separated permanently. Brody moved out of the marital home and initially stayed at a facility owned by the family business, but later purchased an RV that he parked on the marital property. In July, Brody filed a complaint for dissolution of the parties' marriage requesting joint legal and physical custody of the parties' minor children. Chelsey counterclaimed requesting sole legal and physical custody of the parties' minor children.

In late August 2022, the court entered an order that awarded the parties joint temporary legal custody with Chelsey having final decisionmaking if the parties could not agree. The order further awarded Chelsey primary physical custody of the parties' children subject to Brody's specified parenting time. The court's temporary order provided that "[n]either party may use alcohol or non-prescribed controlled substances during their parenting time or within 12 hours before the start of their parenting time." The order also excluded Brody from the parties' real estate. However, after Brody left the residence, Chelsey noticed that security cameras had been placed around the property pointing to the marital residence. Security cameras had not been previously present on the marital property. Shortly after finding the security cameras, Chelsey and the children moved out of the marital home.

Prior to trial, the parties were able to agree on the disposition of their marital property and holiday parenting time. Accordingly, the evidence presented during the trial focused on the issues of custody and child support.

## 2. TRIAL

The trial was held over 3 days in August 2023. Witnesses at trial included Brody; Chelsey; Brody's mother and father; Dallas Massey, a mental health and drug and alcohol therapist who conducted an alcohol evaluation on Brody in September 2022; and Dyllan Gies, Brody's oldest daughter.

The majority of the evidence adduced focused on (a) Brody and Chelsey's alcohol use, (b) Chelsey's alleged interference in Brody's relationships with his family, including his parents and his daughter Dyllan Gies, and (c) the parties' involvement in their children's lives and their respective relationships with their children.

### (a) Evidence Regarding the Parties' Alcohol Use

The evidence established that both Chelsey and Brody drank alcohol during their marriage, with Chelsey testifying that she abstained while she was pregnant and breastfeeding. According to

Chelsey, Brody's drinking was a consistent problem during their marriage, with Brody consistently drinking to the point of intoxication, and 2 to 3 times per week drinking until he passed out. Drinking was also an issue for Brody prior to the parties' marriage as evidenced by Brody's conviction of DUI at the age of 19 and being convicted for being a minor in possession.

Brody's alcohol consumption culminated in a significant event in May 2016, when after a day of drinking, Brody suffered a traumatic brain injury. According to Chelsey, Brody, who was drunk, jumped on the back of a golf cart and was "rocking [it] back and forth." Brody fell from the moving golf cart and hit his head on the gravel road. Chelsey stated that Brody was unconscious and was in a pool of blood coming out of his ear. Brody was life-flighted to the hospital. Chelsey stated that after Brody regained consciousness in the hospital, he experienced "a lot of mood changes, paranoia, [and] hallucinations," and at times, he could not remember things or would repeat the same questions. Brody was discharged from the hospital after 2 weeks. According to Chelsey, after Brody's discharge, he did not like loud noises or bright lights, was "confused a lot of the time," "had fits of paranoia," and was convinced that people were in their basement or outside of their home.

Brody returned to work 1 or 2 months after the accident and did not drink any alcohol for 14 months. Brody stated that the only lasting effect from the accident was that he has no taste or smell. However, Chelsey testified that when Brody resumed drinking after his brain injury, he "seemed angry a lot of the time. I thought that [it] might just be kind of a lingering . . . symptom from the injury . . . mood fluctuations and things like that. I kind of always assumed it would get better." However, in 2018, Brody's behavior after drinking became "ragey." Chelsey's testimony provided greater detail regarding why she believed Brody's alcohol use has been, and remains, a problem as it relates to their marriage and family. Additionally, Chelsey introduced into evidence two letters from Brody to her and the children documenting the nature and extent of Brody's alcohol abuse. In Brody's letter to Chelsey, he admitted to drinking excessively and that his drinking had negatively impacted his family. In Brody's letter to his children, he expressed that he was "so very sorry for tearing our family apart," and he admitted to making "some really bad, big choices in [his] life." He told the children that he was "not happy with [his] choices in life that put us all here" and that he was "working on [him]self" and would "become the father figure that you all need and deserve."

Brody admitted that his drinking increased approximately 5 to 6 months prior to the parties' separation in April 2022 as a means of coping with the parties' toxic relationship. Brody reported that at that time, he was drinking 4 to 5 beers approximately 4 to 5 times per week and that, on some nights, he would have 8 to 10 beers. Despite this, Brody testified that

> to sit here and make this trial about alcohol I think is absolutely crazy. . . . do I drink alcohol; yes, I do. At the end of our relationship, yes, I might've drank a little bit more. Most of the time it was after the kids were [in] bed.

Brody explained that, around that time, he wrote a letter to Chelsey in which he described himself as a drunk, he was in "the worst spot of [his] life." In this letter, Brody describes his drinking problems and his guilt over how those problems have affected his family. He stated that at that time his relationship with Chelsey was "toxic" and that

I had a lot of time to reflect on myself, my life, our relationship, [and] me and my kids's [sic] relationship. And as I sat there and thought about things, yes at the end of our relationship I was to a point I didn't want to go home. When I go there, we would have a few drinks, there wasn't a lot of conversation at the end of our relationship, there wasn't a lot of good in our relationship.

I would still partake with the kids, whatever, after they would go to bed, we would tell them goodnight. Yes, then I would usually be outside, have a few more drinks than what I should be and I thought about those when I wrote this letter to her.

Brody testified that his drinking has never affected his ability to work at the meat market or care for his children and that he never missed any of the children's activities except for one wrestling event that he was unable to attend due to a work obligation.

Brody's mother testified that she became concerned about Brody's drinking in approximately 2018. However, since Brody and Chelsey separated in April 2022, she has not been concerned about his drinking because "[h]e's drinking like my other family members drink and he was not out of control." She further questioned Chelsey's claims that Brody was having drunken rages because when Brody is drunk "[h]e gets this silly grin on his face, he is more of a lover when he's had too much to drink, and he never shuts up. So he talks a lot . . . he hugs when he's had too much to drink." She further testified that she had not observed anything about Brody's drinking that caused her concern about his ability to effectively parent his children. Brody's mother also expressed that she did not have any concerns about Brody's drinking affecting his work performance.

Similarly, Brody's father testified that he has never seen Brody in a drunken rage and that "[i]t's the total opposite of that." According to Brody's father, "when [Brody] drinks a little more than he should, that's when he gets even more talkative and more lovey-dovey . . ." Brody's father testified that Brody is a hard-working, prompt, and responsible co-owner of the family's meat market and Brody's drinking has not caused problems at work. Brody's father also stated that he has not been concerned about Brody's drinking since Brody and Chelsey separated in April 2022 and nothing caused him concern about whether Brody could effectively care for his children.

Massey, a mental health and drug and alcohol therapist, testified that she met with Brody for an alcohol evaluation in September 2022. Based upon Brody's responses regarding his drinking during the previous year, collateral information, and diagnostic screening tools, Massey determined that Brody did not meet the criteria for substance use disorder. Massey had a follow-up visit with Brody in June 2023 during which he reported that he was drinking socially but not to intoxication. Massey opined that Brody's alcohol use would not be a concern regarding his ability to parent. Massey also testified that Brody denied having hangovers, being sick, and experiencing memory lapses. Chelsey disputed this testimony, stating that Brody had hangovers, was sick, and had memory lapses during her last year in the marital home with Brody. Additionally, Chelsey testified that Brody drank in violation of the court's temporary order and did so in the children's presence.

(b) Chelsey's Alleged Interference With
Brody's Relationships With Family Members

Brody's oldest daughter, 17-year-old Dyllan, testified that Chelsey interfered with her relationship with Brody to the extent that they were estranged for a period of time. But, since Brody and Chelsey's separation, Dyllan and Brody's relationship has improved. Similarly, Brody's mother and father testified that Chelsey interfered with Brody's relationship with his mother.

(c) Parties' Respective Relationships With and
Involvement In the Minor Children's Lives

The evidence established that during the parties' marriage, Brody worked at his family's meat market of which he was a part-owner. Chelsey became a stay-at-home parent following Riggley's birth in 2013. After the parties' separation, Chelsey worked part-time as a paralibrarian and, about a month prior to the trial, she obtained a full-time remote position as a claims administrator for an insurance company. At the time of the trial, Riggley was 10 years old, Ebbet was 9 years old, and Crosley was 6 years old. The parties' minor children are doing well and are excelling in school.

Chelsey testified that, during the parties' marriage, she performed all of the household duties including cooking, cleaning, laundry, shopping, and scheduling and attending the children's activities including medical appointments and registering them for school. She stated that, although Brody spent time with the children, he and the children were not close and they did not share a bond. Chelsey testified that joint legal and physical custody with Brody was not workable because she had "absolutely zero confidence that he is a capable or healthy parent in any capacity, but as far as coparenting, it's an impossibility."

Chelsey testified that it was in the children's best interests for her to be awarded primary custody because the children are stable, secure, and safe, and disrupting that "would make no sense to me." She stated that "[t]he only issues are the coparenting time that [Brody] already has." Chelsey also expressed her opinion that Brody was not capable of taking care of the children's physical and emotional needs. Chelsey testified that she is

the only thing that has ever been consistent in [the children's] lives. When they are with me at home, they are stable, they are secure, they are safe, . . . they are well taken care of. And not just physical needs, not just cooking a meal and getting them dressed . . . for school; their emotional well-being is handled . . . everything from being respectful kids and knowing good friends from bad friends . . . being a humble loser and a humble winner during sports. All the things that come with being a parent that is home.

Brody disputed much of Chelsey's testimony. He stated that he helped with cooking, cleaning, and taking care of the children. Brody testified that his relationship with his children is "awesome" and that he is "a very active father," including coaching Riggley's softball team, coaching Ebbet's baseball and football teams, and attending Ebbet's wrestling tournaments. He described Riggley as a little girl who "has no cares in the world" and likes music, art, cooking, playing cards, and playing with barbies. Brody testified that he and Ebbet bond over fantasy football, sports, and Ebbet's participation in sports. Brody described Crosley as "very to himself

but . . . tougher than he knows. He's good at everything because he watches his older siblings. . . . he just wants to go have fun and he wants to play golf . . . And that's what we do out in the yard is [play] basketball, golf, [and] football." Brody stated that he and Crosley are early risers so they spend time together watching cartoons. Crosley "loves life," has a "good attitude," and "loves being outdoors."

Brody's father testified that Brody is "a very good dad" and "very" involved with his children. Brody engaged in a lot of outside activities with the children including shooting baskets and practicing baseball, softball, and football. Similarly, Brody's mother described Brody as a "very good dad" and "a hands-on dad" and that, when Brody has time with the children, they play with Legos, play cards, and play outdoors.

### 3. DISSOLUTION DECREE

In September 2023, the court filed an order awarding the parties joint legal custody with Chelsey having final decisionmaking authority and awarding Chelsey sole physical custody of the minor children. Brody was ordered to pay $899 in monthly child support for the parties' three minor children. Regarding the custody award, the court noted that Chelsey has always been the children's primary caregiver and has been a stay-at-home mother for the majority of the parties' marriage. The court noted that

> Much of the evidence in this case centered around Brody's drinking. Both parties present very different pictures of what Brody's drinking actually looks like. The Court [finds] that Chelsey was more credible with regard to her testimony of Brody's drinking. Although both parties drank during the duration of their marriage, Brody's drinking was a significant problem. He admits as much in Exhibits 58 and 59.

The court further found that "a joint custody arrangement is not a workable option with these parties. Brody refuses to get along and is subject to outbursts. The voicemail he left Chelsey is telling and indicative of how Brody reacts when things do not go his way."

## III. ASSIGNMENTS OF ERROR

Brody assigns as error that the district court erred in (1) failing to award the parties joint custody and (2) not utilizing a joint custody child support calculation.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Radmanesh v. Radmanesh*, 315 Neb. 393, 996 N.W.2d 592 (2023). In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id.* When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## V. ANALYSIS

### 1. PHYSICAL CUSTODY

Brody first assigns as error that the district court abused its discretion in failing to award the parties joint physical custody of their minor children. He contends that the district court placed too much emphasis on his issues with alcohol. Brody admits that he had alcohol issues at the time of the parties' separation but argued that he had remedied that issue in the 1½ years since the parties' separation. He also argues that the evidence did not support the court's finding that joint physical custody was not a workable option between the parties.

In determining child custody issues, the overriding consideration is the best interests of the children. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017). In evaluating the children's best interests, courts are directed to consider what parenting arrangement will best provide for children's safety, emotional and physical health, and stability, with an emphasis on continuous school attendance and progress. Neb. Rev. Stat. § 43-2923(1) (Reissue 2016).

The standard for determining custody is parental fitness and the child's best interests. *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006). Nebraska's Parenting Act states that it is in the best interests of the child to have a "safe, stable, and nurturing environment." Neb. Rev. Stat. § 43-2921 (Reissue 2016). To determine the best interests of a child, a court must consider, at a minimum: (1) the relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; (2) the desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning; (3) the general health, welfare, and social behavior of the minor child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. § 43-2923(6). Other pertinent factors a court may consider in determining the best interests of a child include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy education needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

Here, a substantial amount of the testimony presented at trial focused on the parties' alcohol use. Because the parties placed an emphasis on this issue, we reject Brody's claim that the court erred in also placing emphasis on that issue. We also note that although testimony of Brody and Chelsey as well as other witnesses differed on the extent of Brody's alcohol use and its effects on his actions, it is apparent from the record that Brody has suffered both ill effects and complications due to the use of alcohol in his life. And despite the court's temporary order providing that "[n]either party may use alcohol or non-prescribed controlled substances during their parenting time or within 12 hours before the start of their parenting time," Chelsey testified that Brody drank in violation of the court's temporary order and did so in the children's presence. This evidence stands in stark contrast to Brody's testimony that he no longer struggles to control his use of alcohol and it supports the court's finding that Brody's alcohol use was, and remains, a problem. Despite Brody's attempts to minimize the impact alcohol has on his ability to parent his children and to deal with Chelsey, the district court found Chelsey's testimony on the subject more credible.

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Radmanesh v. Radmanesh*, 315 Neb. 393, 996 N.W.2d 592 (2023).

We likewise reject Brody's claim that the court erred in determining that joint physical custody was not a workable option for the parties. The parties do not dispute that Chelsey has been the children's primary caretaker. There is also no dispute that both Brody and Chelsey have good relationships with their children and are loving parents, but they have difficulty communicating with each other. Chelsey testified that their relationship with each other made a joint custody arrangement unworkable. As this court stated in *Coffey v. Coffey*, 11 Neb. App. 788, 661 N.W.2d 327 (2003), when parents are unable or unwilling to execute parenting duties jointly, the result is that one parent or the other must be given primary responsibility for the child's care. The district court found that the communication issues are due, in large measure, to Brody, as evidenced by the voicemail he left for Chelsey. Again, when considering findings of fact, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Radmanesh v. Radmanesh, supra*.

Although Brody clearly loves his children, based on these factors, coupled with Brody's record of prior alcohol-related incidents and Brody's own admissions governing the impact that alcohol had on his married and family life, we find that the record supports the court's conclusion to place physical custody of the parties' children with Chelsey.

## 2. CHILD SUPPORT

Brody's second assignment of error argues:

> To the extent that this Court agrees that [Brody] should have been awarded joint custody, a joint custody child support calculation is appropriate. The District Court should be ordered to reevaluate the child support calculation and calculate child support utilizing a joint custody calculation as set forth in the child support guidelines.

Brief for appellant at 24.

Because we have determined that the district court did not abuse its discretion in failing to award the parties joint physical custody of the parties' minor children, it follows that the court did not abuse its discretion in not ordering child support based upon a joint custody. See *Lasu v. Lasu*, 28 Neb. App. 478, 502, 944 N.W.2d 773, 791 (2020) (having determined that district court did not abuse discretion in awarding appellee legal and physical custody, "we need not address [the appellant's] argument that child support should have been calculated as if the parties were awarded joint custody").

## VI. CONCLUSION

Having determined that the district court did not abuse its discretion in granting Chelsey sole physical custody of the parties' minor children subject to Brody's reasonable parenting time and that, accordingly, we conclude the court likewise did not abuse its discretion in not ordering Brody's child support obligation based upon joint custody, we affirm.

AFFIRMED.