IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


KUCHTA V. KUCHTA


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


MARY J. KUCHTA, APPELLEE,

V.

ANDY J. KUCHTA, APPELLANT.


Filed August 10, 2021.    No. A-21-040.


Appeal from the District Court for Wayne County: JAMES G. KUBE, Judge. Affirmed as modified.

Michelle M. Schlecht, of Copple, Rockey, Schlecht & Mason, P.C., L.L.O., for appellant.

Tracey L. Buettner, of Stratton, DeLay, Doele, Carlson, Buettner & Stover, P.C., L.L.O., for appellee.


RIEDMANN, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

### INTRODUCTION

Andy J. Kuchta appeals from a decree of dissolution entered by the district court for Wayne County, which decree dissolved his marriage to Mary J. Kuchta, divided the marital assets and debts, awarded Mary sole legal and physical custody of the parties' four minor children, and ordered Andy to pay child support. On appeal, Andy asserts that the district court erred by awarding Mary sole legal and physical custody of their minor children, calculating child support based on sole custody to Mary, and in ordering Andy to pay 50 percent of the nonreimbursed health care costs beyond the first $480 per child per year for each of the children. Upon our review of the record, we find that the district court erred in ordering Andy to pay 50 percent of all unreimbursed health care expenses and modify the decree accordingly. We affirm the district court's order in all other respects.

- 1 -

BACKGROUND

Andy and Mary were married in August 2009. Four children were born during the course of the marriage: Daniel, born in 2010; Sarah, born in 2011; Rachel, born in 2013; and Elizabeth, born in 2016. On January 9, 2019, Mary filed a complaint for dissolution of marriage. In the complaint, she specifically asked that the parties' marriage be dissolved, that the marital assets and debts be equitably divided, that she be awarded primary physical custody of the parties' minor children, and that an order of child support be entered. Three months later, on April 16, Mary filed a motion for temporary custody and support. Therein, she asked that the district court enter an award awarding Mary custody of the children subject to reasonable supervised parenting time for Andy.

On May 1, 2019, after an uncontested hearing, the district court entered a temporary order awarding temporary custody to Mary. Mary was also awarded possession of the marital residence. Andy was awarded parenting time every other weekend from Friday at 6 p.m. until Sunday at 6 p.m. and one evening per week from 6 p.m. until 9 p.m. Andy did not file an answer until August 1. In his answer, he requested that the parties receive joint physical and legal custody of the children.

Trial was held on May 26 and October 13, 2020. The primary witnesses were Andy and Mary. In addition, Mary called the director of the daycare for their children. Andy called his sister, his mother, his sister-in-law, and a family friend as witnesses. After the first day of trial, the court entered an order providing for the parties to have equal parenting time for the summer of 2020 on a week on/week off basis. Once school resumed, Andy's parenting time reverted to the every other weekend with one evening a week schedule. We note that though supervised visitation was ordered in the May 2019 temporary order, Mary never required visits to be supervised.

When the parties married, Mary was an 8th grade math teacher in Norfolk Public Schools. She began working toward a Master's degree in 2010, obtaining it in 2013. Mary testified that during this period, Andy provided care for the children while she was studying or attending class. She became an assistant professor at Wayne State College in 2014. As a condition of employment, Mary was required to obtain a doctoral degree. She began work toward her Ph.D. in 2015 and finished it in 2019. Her program was primarily online, but did require attending class one night a week in Vermillion, South Dakota.

At the time of the marriage, Andy worked as a network administrator at a bank in Laurel, Nebraska, a job he had held since 2004. The parties lived in Randolph, Nebraska. Shortly after Mary obtained her position with the college, the family moved to Wayne, Nebraska. Andy was terminated from his position at the bank in July 2017. He then attempted to start his own technology startup business providing computer related services to clients and developing web-based products. He also worked on occasion for his father on his farm. During this period, the parties utilized savings to make up for the shortfall in income they experienced. The startup business was not successful. In February 2019, Andy obtained a job with the hospital in West Point, Nebraska, as a server administrator. That employment ended in October 2019. Since that time he has again tried to establish his own technology related business and has provided labor for his father's farming operation. As of the date of trial, his business had not yet provided sufficient

income to meet expenses, resulting in Andy drawing money from his retirement account to fill the deficit.

Mary testified that she began to notice behavioral changes in Andy beginning in 2016. She explained that Andy became more distant from her, quieter, and paranoid. She provided an example that he told her that while he was at work, he could hear "them talking about him when he was in the office." Andy requested that she turn off her cell phone when she was not using it because he told her that somebody could listen to them through their cell phones. Mary also testified that there was an occasion when everyone at the bank was assigned a room or spot at the bank to clean and Andy spent the entire night cleaning a closet without coming home from work until the end of the next day. Mary explained that this behavior concerned both her and the bank. She also testified that Andy was staying at work late into the night on a frequent basis, thus spending less time with the children. When informed that Andy's job with the bank ended in July 2017, Mary did not believe that Andy left voluntarily. She confronted Andy about why his job ended and he told her, "I'm considering what Suzie said and I can't talk about it." She testified that she still does not know the specific reason why this job ended. Andy testified later in the trial that his job ended due to his asking bank personnel for references for another job. He testified that bank officers were aware of his hope to start his own business.

After Andy's job with the bank ended, he began to work on creating his own technology start-up business from home. During this time, Mary explained that despite working at home, Andy became more distant from the children. Mary testified that Andy offered to keep the two youngest children home while he worked, but Mary enrolled them in preschool or daycare to ensure that the children had structure and to minimize distractions for Andy. While working to establish his technology start-up, Andy would frequently work late into the night and sleep more during the day. The parties agreed that Andy should have 6 months to get his business launched. Thereafter, Andy asked for two 6-month extensions. During this 18-month period, Andy did not develop a marketable product. According to Mary, Andy completed one project for a client which he did for free. Andy stated that he did perform a few small side jobs, but reported little income. During this period, Mary was working full time as a professor, working to obtain her Ph.D., and was, in her view, providing the majority of the care for the children. Andy contended that he remained actively involved with the children.

The parties continued to live together for a period of time after the petition was filed in January 2019. Both testified that they hoped for reconciliation. After Andy obtained the job in West Point, he began attending weekly meetings of a professional organization in Fremont, Nebraska, at night. He also attended networking events and seminars in Lincoln, Nebraska, and Omaha, Nebraska, for people hoping to start technology related businesses. Both parties testified that Andy often did not get home until the early morning hours and then left for work by 6 a.m. Mary testified that this schedule did not allow Andy to spend time with the children. She testified that he often slept excessively on weekends after following this schedule. Andy testified that these activities were helpful to him to gain contacts and ideas for potential web-based products relative to his technology start-up business. He explained that the lateness of his arrival home was due to making frequent stops to avoid falling asleep while driving.

Mary also testified as to her concerns regarding Andy's parenting ability. While she conceded that Andy has been actively involved in the children's activities, she has been the primary

contact for daycare, school, and extracurricular activities. Mary also explained that one child has an individualized learning plan which requires the parents to meet with the teachers, at least once per year. Andy did not attend these meetings. After the parties separated, Andy initially would not spend time with all four children at once. During Andy's parenting time, he would frequently call Mary asking for help with discipline or getting the children settled down to go to sleep. Mary worked with Andy to structure bedtime when the children were with Andy. According to Mary, when the children expressed that they did not want to go with Andy for parenting time, Andy would say, "you may ask whoever you wish." On the first day of trial, Mary testified that Andy had not taken all four children for a full weekend, including overnights. Despite this, Mary expressed that Andy was making efforts to be a better father and that he had a close relationship with all four children.

In her testimony when the trial resumed in October, Mary discussed concerns she had during the summer week on/week off schedule. She first noted that during exchanges at her house, Andy did not encourage the children to get loaded in his car. Rather, he used the exchanges to stay at her house for long periods and try to reconcile with Mary. He would make statements regarding his love for her in front of the children and question her why she did not want to be a family. Mary testified that this confused the children, causing her son to question whether he was at fault for the divorce.

She also testified that Andy did not keep his house clean, did not enforce a bedtime, and did not make sure the children were bathed and clean. She noted that she would see the children wearing the same clothes for several days and that the girls' hair was not brushed. Of most concern was one evening when the parties' 6-year-old daughter left Andy's home after midnight and attempted to walk back to Mary's house. She was spotted by police crossing a highway. The police picked her up and took her to Mary's house. Andy explained that he fell asleep in his recliner with two of the children. He thought the 6-year-old was asleep on the couch when he fell asleep and did not hear her leave. Andy installed a deadbolt lock on the door following this incident to prevent a similar event from happening thereafter.

Finally, Mary testified that Andy and she have significantly different parenting styles. She provides structure and is more of a disciplinarian. Andy tends to try to reason with the children and let them make decisions, hoping that they will choose wisely. Andy testified about many of Mary's concerns. First, he explained that his comments about hearing others talk about him at the bank was with respect to a conversation he had with the president and executive vice president. They told him the walls of the offices were paper thin and that he should not talk too loudly about a $10,000 bonus he received. He also told Mary that when somebody is in the adjacent office, he could hear the conversation that the co-worker was having on the telephone. He explained that his comments about the cell phone related to a conference he attended where he learned about the possibility that someone could take control of mobile devices. He requested Mary to turn off her cell phone because a change occurred on Mary's phone, even though she did not make the change.

Andy attempted to respond to Mary's concerns about his parenting ability. He testified that he has consistently requested for all four children to spend the night with him. One of the children, Sarah, would not spend the night with Andy for a significant period of time. When Rachel would see that Sarah would not spend the night with Andy, she would also choose not to spend the night with Andy. He explained that his parenting style is an empathetic approach where he would "try

to understand how one of our children feels and how maybe the other child that they were in conflict with, felt." He previously discussed with Mary that he does not want to parent through yelling. Andy's primary concern with Mary's parenting ability was that Mary yells at the children. Otherwise he believed Mary to be a good mother. He testified to his belief that both parents needed to be equally involved with the children, and for that reason, he thought joint legal and physical custody was appropriate.

Andy agreed that in 2016 there were behavioral changes on his part that occurred which affected the family. He testified that Mary began to express regret about taking her job with Wayne State, became increasingly frustrated and angry, and as a result began to yell at him more frequently.

Andy's family members all testified generally that Andy had become more withdrawn in 2017 and 2018. This prompted some of them to confront Andy about what was going on. Individual and marital counseling was suggested. Andy's mother explained that she believed this behavior was caused by marital difficulties and Andy was attempting to please Mary. All of his family members testified that Andy was a good father who was attentive and loved his children. They also explained that Andy is generally more patient with the children compared to Mary, who parents through a more stern style. All had seen improvement in Andy's mood and demeanor in the months leading up to the trial.

The director of the children's childcare center testified generally that she does not believe that Andy has the same rapport with the children as Mary does. She also testified that Andy did not seem to want to make the decisions regarding the children, deferring to Mary.

On December 16, 2020, the district court entered a decree of dissolution. The district court determined that the children's best interests would be best served by awarding sole legal and physical custody to Mary. The court noted that for significant periods of time Andy voluntarily absented himself from the home. In addition, the district court noted that Andy was unable to discipline the children without Mary's assistance and had difficulty taking care of all four children at one time. The district court specifically noted that Andy "calls [Mary] a lot during his visitations needing help with discipline issues and difficulties he is having with the kids." Further, the district court expressed concern about Andy's mental health. The district court noted that every witness who testified indicated that something occurred which negatively affected Andy's mental and physical health. The district court noted its own concerns about Andy based upon the manner in which he testified. The court characterized Andy's testimony as "laborious and hard to understand." The court noted that even Andy's own counsel often had to lead Andy through his testimony and that on cross-examination, Andy required repeated admonishments from the court to listen to the question and answer the question that was asked. The district court noted that Andy's inability to answer these questions was a credibility issue because the questions from Andy's counsel were often leading to the point that it was Andy's counsel testifying. Finally, the court noted Andy's difficulties with employment and inability to launch his own business successfully, his deferral of decisionmaking to Mary, and that Mary had been the primary caregiver for the children. The court noted that Andy's parenting style "has not been effective."

As a result, the district court found that it is in the best interests of the children for Mary to be awarded sole physical and legal custody. Andy was awarded parenting time every other weekend from Friday at 7 p.m. until Sunday at 7 p.m. He also received one evening every other

week from 6 p.m. until 9 p.m. The district court also awarded Andy 6 consecutive weeks of parenting time over the summer as well as holiday parenting time. The district court entered a child support order based on sole custody for Mary that ordered Andy to pay $745 per month or 39.55 percent of the monthly support for the children. The district court ordered Mary to maintain the present health insurance coverage on the minor children and pay the first $480 per child per year of non-covered health care expenses. Any amount above $480 per child was ordered to be paid equally by Andy and Mary.

Andy now appeals to this court.

ASSIGNMENTS OF ERROR

Andy assigns that the district court abused its discretion by awarding Mary sole physical and legal custody, by failing to award him adequate parenting time, and in entering a child support order based upon Mary having sole physical custody. Andy also assigns and argues that the district court erred in ordering Andy to pay an equal amount of any non-covered health care expenses for the minor children which exceed $480 per child, per year.

STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019).

ANALYSIS

First, Andy argues that the district court abused its discretion by awarding Mary sole legal and physical custody of the children. He argues that it is in the children's best interests to have equal time with their mother and father since they both have a positive influence on the children's lives. He also argues that the parties can communicate effectively to make joint decisions. He argues that the district court's order does not adequately consider the importance of the parent-child relationship between Andy and the minor children. We address these arguments, in turn.

*Physical Custody.*

Physical custody is the authority and responsibility regarding the child's place of residence and the exertion of continuous parenting time for significant periods of time. *State on behalf of*

*Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). Joint physical custody means mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time. *Id.*

All determinations of custody and parenting time are based on factors affecting the best interests of the child. *Id.* In determining the best interests of the child, the statutory factors that the court considers include: the relationship of the minor child to each parent; the desires and wishes of the minor child, if of an age of comprehension, but regardless of chronological age, when such desires and wishes are based on sound reasoning; the general health, welfare, and social behavior of the minor child, and credible evidence of abuse. Neb. Rev. Stat. § 43-2923 (Reissue 2016). In addition to these statutory "best interests" factors, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear, supra*. No single factor in the best interests analysis is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020).

In the present case, the district court determined that it was in the best interests of the children for Mary to receive sole physical custody. We find no abuse of discretion in the district court's determination.

The evidence demonstrated that Andy had difficulties in providing a clean house for the children, keeping them clean and groomed, and providing sufficient structure and direction in order to get the children to follow directives. Prior to his summer parenting time, Andy rarely was able to have all four children with him overnight when he was exercising parenting time. He was unable to get them to bed consistently without Mary's assistance and frequently contacted Mary for help to discipline the children. During his parenting time, his 6-year-old daughter snuck out of the house late at night while Andy was asleep in a recliner with two other children. Fortunately, she was discovered unharmed by police. While it is clear that Andy loves his children, his parenting style has resulted in issues of concern. The evidence also raises issues of concern regarding his lack of gainful employment and depletion of assets, calling into question whether he will be able to maintain a residence suitable for the children to live in. We further note that until just before trial, Mary was the only parent who participated in parent-teacher conferences. While earlier in the marriage, Andy took on extra duties of care, the evidence established that in more recent years, Mary was the primary caregiver.

There was also significant testimony with respect to the stability of Andy's character. The district court noted that every witness who testified expressed an opinion that something had occurred which affected Andy's mental health. The court also observed that Andy would not answer questions when put directly before him, which became a credibility issue. The court's findings regarding credibility weigh heavily in our review. We recognize that no expert testified as to any mental illness or impairment. However, even Andy's family members noted concerns for his well-being. While Andy's condition appeared to improve prior to trial, the court still had

concerns based on the manner in which he testified. Based upon our standard of review, which includes deference to the trial judge who heard and observed the witnesses testify, we find no abuse of discretion by the district court in its determination that it was in the best interests of the children to award sole physical custody of the children to Mary.

*Legal Custody.*

Legal custody focuses entirely on decisionmaking authority and is defined as the authority and responsibility for making fundamental decisions regarding the child's welfare, including choices regarding education and health. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). Joint legal custody is the joint authority and responsibility for making major decisions regarding the child's welfare, while sole legal custody essentially establishes that one party will have final say in decisions. *Vyhlidal v. Vyhlidal*, 309 Neb. 376, 960 N.W.2d 309 (2021). Courts typically do not award joint legal custody when the parties are unable to communicate effectively. *Lasu v. Lasu*, 28 Neb. App. 478, 944 N.W.2d 773 (2020). In addition to the best interests of the children and the parent's ability to communicate, we also consider who has been primarily responsible for the child's care throughout his or her life. See *Lasu v. Lasu, supra.*

Based on the record before us, we find no abuse of discretion in determining that it was in the best interests of the children for Mary to have sole legal custody. Mary has been the primary caregiver for the children throughout their lives and has been the primary person to make most of the major decisions regarding their welfare. Mary is the parent who regularly signs them up for extracurricular activities and is the one who is the contact for school, daycare, and extracurricular activities. Andy has been reluctant to make decisions or even respond to questions. The director of the childcare center testified that when she asked questions of Andy, he indicated that she should consult with Mary. It does appear that the parties can communicate. The court noted that Mary has involved Andy in her decisionmaking process, but found, based on the evidence, that she should have sole legal custody with final decisionmaking authority. We find no abuse of discretion in the court's finding.

*Parenting Time.*

Andy was awarded parenting time every other weekend from Friday at 7 p.m. until Sunday at 7 p.m. He also received one evening every other week from 6 p.m. until 9 p.m. In addition, the court awarded Andy 6 consecutive weeks of parenting time over the summer along with periods of holiday visitation. Andy argues that the district court abused its discretion in its award of parenting time because he had more parenting time during the pendency of the proceedings. Under the temporary order, he received parenting time every other weekend and one evening per week and during the summer, the parties alternated parenting time every week.

The Parenting Act, Neb. Rev. Stat. §§ 43-2920 to 43-2943 (Reissue 2016 & Cum. Supp. 2018), does not require any particular parenting time schedule to accompany an award of either sole or joint physical custody, and there exists a broad continuum of possible parenting time schedules that can be in the child's best interests. *State on behalf of Kaaden S. v. Jeffery T., supra.* The Parenting Act requires that all custody and parenting time arrangements be determined based on the best interests of the child. § 43-2923(6). The Parenting Act presumes the critical importance

of the parent-child relationship in the welfare and development of the child and that the relationship between the child and each parent should be equally considered unless it is contrary to the best interests of the child. § 43-2921. The best interests of the child require, among other things: appropriate, continuing, quality contact between the child and parents who have shown the ability to act in the child's best interests. § 43-2923(3).

The trial court has discretion to set a reasonable parenting time schedule. *Schmeidler v. Schmeidler*, 25 Neb. App. 802, 912 N.W.2d 278 (2018). A reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004). The determination of reasonableness is to be made on a case-by-case basis. *Id.* The best interests of a child require that the child's family remain appropriately active and involved in parenting with safe, appropriate, continuing quality contact between the child and her family when they have shown the ability to act in the best interests of the child and have shared in the responsibilities of raising the child. *Thompson v. Thompson*, 24 Neb. App. 349, 887 N.W.2d 52 (2016). When making determinations as to the allocation of parenting time, a trial court should consider the parties' ability to communicate on issues such as transportation, homework, discipline, medical and dental appointments, and extracurricular activities. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). Other relevant considerations include stability in the child's routine, minimization of contact and conflict between the parents, and the general nature and health of the individual child. *Id.*

In the present case, Andy argues that his ability to parent the children improved during the course of the temporary order, particularly during his summer parenting time. However, Mary presented evidence that Andy struggled during his summer parenting time with the children. Mary testified that Andy contacted her to help discipline the children and that until summer, Andy rarely exercised his parenting time with all four children.

Under our standard of review, we do not supplant the district court's determinations with our own. We are mindful that the district court had the benefit of observing the witnesses testify and judging their credibility. Therefore, we must give deference to the finding of the district court which gave little weight to Andy's testimony. The district court found Andy "cannot manage the children sufficiently for weekend visitation, let alone a 50/50 parenting arrangement." We share the court's concern. Andy experienced great difficulty in managing, among other things, the children's bedtime. Given the children's ages, granting him parenting time that would place the children in his care overnight on school nights would appear detrimental to the children's best interests. We find no abuse of discretion in the district court's determinations regarding parenting time.

*Child Support Order.*

Andy argues that the district erred in ordering a child support order utilizing a sole custody calculation instead of a joint custody calculation. Because we find that the district court did not abuse its discretion in determining that Mary should have sole custody of the children, we also find this error to be without merit.

*Nonreimbursed Health Care Expenses.*

Andy assigns and argues that the district court erred when it determined that he should be responsible for 50 percent of the children's health care expenses after Mary pays the first $480 per year per child. Andy argues that the child support calculation demonstrates that his portion of the children's support is 39.55 percent. Based on that calculation he contends that his allocation of the unreimbursed health care expenses should not exceed 39.55 percent. Mary concedes that the district court erred in requiring Andy to pay 50 percent of the nonreimbursed health care expenses. We agree with the parties.

According to the Child Support Guidelines, a child support order shall address how the parents will provide for the children's health care needs through health insurance, as well as pay for nonreimbursed reasonable and necessary children's health care costs. Neb. Ct. R. § 4-215. Children's health care expenses are specifically included in the guidelines and effective January 1, 2020, the health care expenses are included in the amount of child support paid up to $250 per child per year. *Id.* All nonreimbursed reasonable and necessary children's health care costs in excess of $250 per child per year shall be allocated to the obligor's share of the monthly support. *Id.* Prior to the most recent amendment, the obligor parent was not required to pay for nonreimbursed health care expenses until the first $480 had been paid by the custodial parent. The obligor parent cannot be required to pay more than his or her percentage obligation as determined on the child support worksheet.

Upon our review of the record, we find that the district court erred in determining that Andy was responsible for half of the nonreimbursed reasonable and necessary children's health care costs in excess of $480 per child per year. We note that the order was entered on December 6, 2020, after the change in the Child Support Guidelines was effective. In our de novo review of the record, we apply the current guidelines to determine the level of obligation concerning nonreimbursed medical expenses. See *Stuczynski v. Stuczynski*, 238 Neb. 368, 471 N.W.2d 122 (1991) (applying current guidelines as opposed to guidelines effective when case was decided to result in fair and equitable child support order). Therefore, Andy should only be required to pay 39.55 percent of nonreimbursed health care costs after Mary has paid the first $250 per child per year. We modify this portion of the decree to provide that Andy pay 39.55 percent of nonreimbursed health care expenses after Mary has paid the first $250 per child per year.

## CONCLUSION

For the reasons discussed above, we affirm the district court's decisions with respect to custody, parenting time, and child support. We modify the district court's decision regarding nonreimbursed health care expenses as set out herein.

AFFIRMED AS MODIFIED.