IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

HERRERA V. HERRERA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STEFFEN P. HERRERA, APPELLEE,

V.

VICTORIA G. HERRERA, APPELLANT.

Filed March 22, 2022.    No. A-21-450.

Appeal from the District Court for Douglas County: LEIGH ANN RETELSDORF, Judge. Affirmed.

Victoria G. Herrera, pro se.

Robin L. Binning, of Binning & Plambeck, for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

The Douglas County District Court entered an order modifying the November 2017 marriage dissolution decree of Steffen P. Herrera and Victoria G. Herrera. The original decree granted Victoria sole legal and physical custody of the parties' four children, subject to Steffen's parenting time. In June 2020, following concerning behavior by Victoria which placed the children at risk of harm, Steffen moved to modify the decree. The modification order awarded Steffen sole legal and physical custody of the parties' children, subject to Victoria's supervised parenting time. Victoria, pro se, appeals. We affirm.

- 1 -

## II. BACKGROUND

### 1. DECREE OF DISSOLUTION

Steffen and Victoria were married in 2004. Four children were born during their marriage: Osiris, born in 2006; Karma, born in 2007; Sylvia, born in 2009; and Viviana, born in 2012. Victoria also has an older daughter, Alyssa, who was born in 2001 from a prior relationship. Alyssa lived with the parties during the marriage and with Victoria after the divorce. In 2010, the parties agreed that Victoria would homeschool their children.

In November 2017, the district court entered a decree dissolving the parties' marriage. At trial, Victoria appeared personally with representation. The decree noted that Steffen did not personally appear and was not represented by an attorney at trial. As will later be described in further detail, Steffen was in the custody of law enforcement at the time of trial due to criminal charges filed against him; the charges were subsequently dropped. The decree awarded Victoria sole legal and physical custody of the parties' children subject to Steffen's parenting time as set forth in the parenting plan attached to the decree. The decree also required Steffen to pay $1,122 per month in child support for four children and $350 per month in alimony.

### 2. COMPLAINT FOR MODIFICATION

#### (a) Postdecree Events

Following the entry of the decree, the parties' children lived with Victoria, and Steffen had parenting time one day per week and every other weekend. We note that several reports were made to the Nebraska Department of Health and Human Services in the years following the divorce concerning the well-being of the children in Victoria's custody, although the children were never removed from the home. In the summer of 2019, Steffen moved from Nebraska to Minnesota for better employment prospects due to his inability to pay the amount of child support and alimony ordered by the decree. While living in Minnesota, he traveled to Nebraska to exercise his parenting time with the children and would otherwise keep in contact through phone calls and other methods of remote communication. After discussing the matter with Victoria, Steffen's trips to Nebraska became less frequent due to the COVID-19 pandemic and related travel restrictions.

On June 7 and 8, 2020, a series of events occurred involving Victoria and the children. Throughout the late night of June 7 and early morning of June 8, Victoria kept the children awake and exhibited paranoid behaviors that alarmed the older children. During the early morning of June 8, Victoria locked Alyssa and Karma out of the family residence. Shortly thereafter, Victoria had Osiris, Sylvia, and Viviana get into her vehicle and she then proceeded to drive recklessly to another location, culminating in a traffic accident. When law enforcement initially contacted Alyssa at the family residence in response to a dispatch call about a "disturbance," Alyssa informed them that her mother had not slept in days and "was acting paranoid and was afraid that everybody in the apartment complex that they reside [in] was going to die."

Law enforcement subsequently received a dispatch that there was a "hit-and-run accident of a vehicle that matched the description" of Victoria's vehicle. At the scene of the accident, there was an unoccupied minivan and a truck; the truck owner indicated that "a female and children left that minivan" and went to a nearby house. When knocking on the door of the house, police heard "yelling and screaming." Officers made contact with Victoria inside the house where she was

"yelling, screaming at one of the residents there as they were trying to calm her down." The children were in the living room. An officer observed the children to be "nervous," "scared," and "in shock." As officers spoke with Victoria, she was behaving "erratically" and "paranoid" with "fast speech." Victoria explained to the officers that she feared for the safety of people she knew as a result of her presence at a protest and comments she posted online. She was worried about a person at that residence not answering the phone and Victoria "was fearful that they were dead," so she "hopped curbs" and was driving in a "reckless manner with the children" in an attempt to locate the people at that residence.

Officers subsequently arrested Victoria and placed her in the back of the officers' cruiser. As the officers transported her to a county corrections facility, Victoria managed to free herself from her handcuffs and began "banging the Plexiglas partition" which separated the front and back of the cruiser. She threatened that she was "going to stab" the officers and that she "wanted to fight, and that if [the officers] were going to fight, that [they] were going to have to shoot her." She said she did not believe they were "real police officers" and started yelling out the cruiser's window that she was being abducted. Upon arrival at the corrections facility, officers attempted to remove Victoria from the cruiser. She punched and kicked at the officers, striking one in the face with the loose handcuff. "She was kicking, punching, scratching, yelling, screaming, and at one point [an officer] had to take her hand off of [his] partner's gun," which Victoria was "attempting to grab." Law enforcement eventually restrained Victoria by cuffing her hands and feet and by putting her in a restraint chair with a "spit mask because she was attempting to spit at officers." She was booked on multiple charges, including three counts of child neglect, resisting arrest, and assault on an officer. Victoria was subsequently placed on mental health diversion for these charges.

After Victoria was taken into police custody, the children's paternal and maternal grandmothers helped provide for their care and to prevent foster placement. Steffen was apprised of the circumstances and subsequently remained in frequent contact with the children. The children's paternal grandmother thereafter worked with the Nebraska Department of Health and Human Services to develop a safety plan for the children.

(b) Pretrial Proceedings

Steffen filed a complaint on June 12, 2020, requesting modification of the November 2017 decree. Steffen alleged that a material change in circumstances had occurred in that it was no longer in the children's best interests for Victoria to have sole legal and physical custody. Steffen also filed an ex parte motion that same day, requesting temporary custody of the parties' children and permission to remove the children from Nebraska to Minnesota during the pendency of the modification proceeding. The district court entered an ex parte order on June 15, 2020, granting Steffen's requests for temporary custody and removal.

Following a hearing held on June 25, 2020, the district court entered a temporary order requiring the children to be returned from Minnesota to Nebraska, stating that it was "not comfortable with the children remaining removed from the State of Nebraska on a temporary basis pending trial." The court ordered that Steffen would retain temporary legal and physical custody of the children subject to Victoria's supervised parenting time. Steffen was given permission by

the court to place the children in the care of their paternal grandparents during the course of this action.

On July 10, 2020, Victoria, then pro se, filed an answer denying the allegations in Steffen's complaint for modification. She subsequently retained counsel and filed an "Application for Complaint Citation" on August 4, requesting the district court to cite Steffen for contempt due to, among other allegations, Steffen claiming the parties' children as tax exemptions and receiving "stimulus checks for the children" that Victoria claimed she was entitled to receive as the custodial parent. An August 5 order temporarily suspended Steffen's child support obligation under the November 2017 decree. We also note that Steffen returned to Nebraska prior to trial upon securing new employment.

### (c) Trial Testimony

Trial was held over the course of 2 days in February 2021, a third day in March, and a final day in April. Prior to trial, Victoria had retained new counsel. Numerous exhibits were offered and received. The parties both testified and each called several witnesses. In addition to other third parties, Steffen called the children's maternal and paternal grandmothers to testify on his behalf, and Victoria called two of her cousins to testify on her behalf. There was significant crossover between the testimonies of Steffen and Victoria and the testimony of these familial witnesses, and we focus primarily on the parties' testimonies regarding their relationships with the children.

### (i) Osiris and Karma

Over Victoria's objection, Osiris, age 14, and Karma, age 13, testified in chambers with the trial judge, attorneys, and guardian ad litem present. The district court ordered the children's testimony to not be shared with either Steffen or Victoria. The children's testimony is sealed, and while we have reviewed and considered their testimony in our de novo review of the record, we will not recount it here.

### (ii) Dr. Glenda Cottam

Dr. Glenda Cottam is a clinical psychologist who began to provide "therapeutic support for the [parties'] children" in July 2020. She testified regarding her interactions with and observations of the parties' four children. In general, she did not believe the children were coached or otherwise instructed to tell her particular things by third parties.

Dr. Cottam described Osiris as "[g]uarded, soft-spoken, sad, [and] kind of worried about what was going to happen in the future." Dr. Cottam's mental health diagnosis for Osiris included "anxiety . . . and depression . . . not otherwise specified" that was "[n]ot quite to the level of major depression." According to Dr. Cottam, "[t]here were some challenges on the academic screens" that she administered to Osiris. She noted that Osiris' "math score [in this testing] was suggestive of a third-grade equivalency," although his "other scores in . . . word reading, sentence comprehension, and spelling were all in the average range." She believed that continued counseling was "necessary for Osiris" due to several factors such as changed family dynamics and attendance of public school rather than homeschooling among other personal changes.

Dr. Cottam also testified regarding Osiris' relationship with his parents. She stated that Osiris' "relationship with his mother is not very good at all right now," in part due to the lingering

emotional effects of the incident on June 8, 2020. Dr. Cottam's understanding was that during Victoria's parenting time, Osiris was "withdrawn, [did not] interact much, [and] just kind of maybe goes into his own shell" while "actively avoid[ing] contact," although she believed that "there could be some healing if there is some family therapy [and] if they find some common grounds of activities that they enjoy doing together[.]" She testified that unsupervised parenting time between Victoria and Osiris "would not in any way be a good idea" due to risks of further estrangement between the two. Conversely, Dr. Cottam testified that Osiris "has a good relationship with his father," "looks up to [him]," and "wants to be with [him] very, very much." She believed there may be some lingering issues due to Steffen's move to Minnesota and limited contact, but she did not believe there were any concerns with Steffen having legal and physical custody despite Steffen's criminal history.

In describing Karma, Dr. Cottam noted that she was "very insecure [and] very shy" with "very poor" self-confidence. Dr. Cottam diagnosed Karma with "major depression" and "significant anxiety." As with Osiris, Dr. Cottam administered several tests regarding Karma's academic proficiency. She testified that the results indicated that Karma had "some challenges with processing speed" but otherwise fell into average ranges in other metrics. Dr. Cottam also observed that Karma was having difficulties in her social development and making friends. She felt that Karma was making some progress in these areas despite continuing struggles with her mental health, although Dr. Cottam noted that Karma's "depression was significant enough" just prior to trial that she "urged the consideration of an age-appropriate antidepressant."

Dr. Cottam described Karma's relationship with Victoria as "strained," noting that there were "some challenges in the attachment and bonding with her mother." She believed there were "trust issues that need to be worked out in therapy prior to moving forward" from supervised parenting time, as Karma "worried about [Victoria] being mad at her [and] yelling at her." Dr. Cottam did not have any concerns regarding Karma's relationship with Steffen.

Dr. Cottam had less concerns with respect to Sylvia's well-being. She diagnosed Sylvia with an "[a]djustment disorder" and described that Sylvia was experiencing "[a] little bit of anxiety, a little bit of confusion, [and] some uncertainty," although Sylvia had substantially improved since July 2020. Sylvia also had lower academic scores in the tests administered by Dr. Cottam, indicating "some challenges with math [and] spelling." Sylvia also was initially "having pretty significant problems with reading" in that she was "reading significantly below her grade average" due to not being "taught to read"; however, Dr. Cottam felt that Sylvia would get caught up through school, "especially if she continues to have a little bit of extra help with reading and tutoring." We note that Dr. Cottam's assessment concerning Sylvia's reading ability mirrors the testimony given by Kristin Quinn, a reading specialist teacher who had been working with Sylvia to advance her reading ability. Dr. Cottam expressed that she did "[n]ot really" have any concerns if Sylvia were placed in Victoria's custody, although she was "worried about going back to the idea of homeschool" and not "having traditional medical and dental appointments." She further observed that Sylvia's relationship with Steffen "[s]eem[ed] to be a positive relationship" and otherwise had little concern with his parenting other than his move to Minnesota.

Dr. Cottam had similar concerns regarding Viviana. She diagnosed Viviana as having an adjustment disorder that was "[p]retty mild." Like Sylvia, Viviana's test results also indicated that she was initially "way below grade level" with respect to academic proficiency, although Dr.

Cottam also noted that Viviana was making "good progress" in school. Dr. Cottam believed that Viviana had a "fairly good relationship" with Victoria, and she did not have any concerns about Viviana's relationship with Steffen.

Dr. Cottam also testified specifically regarding Steffen and Victoria. She noted that her interactions with both parents were limited, and she had not conducted a parenting assessment of either parent before trial. Based on her interactions with Steffen, Dr. Cottam's "main concern was that he didn't stay in Nebraska to be hands-on" with the children. Conversely, Dr. Cottam was concerned that Victoria had "some type of mental health condition," but Dr. Cottam elected not to give a specific diagnosis due to her limited interactions with Victoria.

Concerning the children's placement with their paternal grandparents during the pendency of this matter, Dr. Cottam believed the children all "have an excellent relationship" with their paternal grandmother, Karen Smith-Clopton, and "feel secure[,] safe, and comfortable" in Smith-Clopton's home.

### (iii) Angela Mitchell

Angela Mitchell is a child and family specialist with the Nebraska Department of Health and Human Services. She first had contact with the family in June 2017 following an intake which reported allegations of physical and educational neglect. During the investigation, Victoria provided Mitchell with documentation that she was certified to homeschool the children, but she denied Mitchell's request to interview the children and did not provide information concerning the children's educational progress. Mitchell denied seeing the children during this investigation, testifying that a coworker also assigned to investigate observed the children instead. No safety threats were identified in Victoria's home during this investigation, and Mitchell closed the intake due to insufficient evidence indicating any neglect had occurred. Mitchell investigated subsequent intakes in October 2017 and March 2018 concerning similar allegations of neglect and isolation. During these investigations, Victoria provided Mitchell "very limited access to the children." Both intakes were closed due to the absence of identified safety threats or evidence of potential neglect and isolation.

Following the events on June 7 and 8, 2020, Mitchell investigated the intake received after the accident occurred. At that time, the children had been placed with Smith-Clopton, and Mitchell carried out an unannounced visit of Smith-Clopton's residence on June 9. During this visit, she privately interviewed the children concerning the events on June 7 and 8, as well as other household circumstances. Mitchell testified that the children were "behind . . . where they should have been educationally" and were "not being taught at home" except for "every once in a while [when] their older sister[, Alyssa,] would teach them if she didn't have to work." Other issues discovered included the children's lack of historic medical or dental care and reports from Sylvia and Viviana expressing that they were afraid to "go back to [Victoria's] home due to . . . bugs in the home." The children were subsequently "safety-planned . . . out of [Victoria's] home" and placed in Smith-Clopton's home.

### (iv) Jeffrey Wagner

Attorney Jeffrey Wagner was appointed guardian ad litem for the children by the district court in a stipulated order entered on August 19, 2020. Following his appointment, he spoke with Victoria, Steffen, the children, Dr. Cottam, and the children's grandmothers.

Wagner spoke with the children both as a group and individually. He described them as "very reserved," "very quiet," and "very soft-spoken" when he met them as a group. Based on his conversations with Osiris and Karma, Wagner testified that he had concerns that the children were not actually being homeschooled but instead were "left to their own devices in trying to forge an educational path forward." These conversations with the children also raised concerns regarding the children not being taken to doctors when ill, the "lack of standard Western medical care," and the occasional "lack of food." He observed the children to be "very thin" but could not tell whether the children were "underweight."

Wagner also testified that the children presented as "sad and sullen," although he noted that Sylvia and Viviana appeared less so than Osiris and Karma. With respect to the two oldest children, Wagner felt a "sad sense of isolation by these kids in [Victoria's] home," believing that they were "being limited as to what they could do and where they could go and not generally having what we would characterize as a typical" upbringing with "normal peer relationships." He also did not believe the children were coached by a third party, testifying that the children "spoke with age-appropriate terms" and described the same events "a little differently."

Wagner met with Victoria early on in this matter. Wagner had concerns about Victoria's mental health prior to this meeting based on his understanding of the incident on June 8, 2020, and these concerns remained after meeting with Victoria. He testified that at the time of trial, he had not received any documentation of mental health treatment undergone by Victoria or of any prognosis or diagnosis provided by a mental health professional. He felt that Victoria "did not seem to appreciate the gravity" of the events that transpired on June 7 and 8. Wagner further testified that he had concerns about Victoria's "ability to make rational decisions in the children's best interest regarding educational needs [and] health care."

Regarding Steffen, Wagner expressed limited concerns regarding his relationships with the children. Wagner affirmed that he was aware of Steffen's criminal history and, to an extent, the circumstances of Steffen's previous convictions and charges; Steffen's criminal history did not cause Wagner concern regarding Steffen being granted custody of the children. Wagner did note concerns regarding Steffen's move to Minnesota, but he testified that this was alleviated upon Steffen's return to Nebraska. Wagner recommended that Steffen be granted legal and physical custody of the children subject to Victoria's supervised parenting time.

### (v) Michael Flairty

Michael Flairty was the appointed supervisor of Victoria's parenting time with the children in accordance with the stipulated order entered on August 19, 2020. Flairty affirmed that he did not observe "anything inappropriate" during Victoria's parenting time, although he noted that Osiris "kind of shut[] down" when the children visited their mother. Flairty had no concerns with any of the locations where parenting time occurred, including Victoria's residence. He described that the first visit he supervised was not "productive" and required him to "redirect both the children and the mom" due to an argument between Victoria and Osiris. He also testified that the

children initiated conversations regarding the custody modification and that Victoria "appear[ed] to listen" and responded to the children's concerns in some amount of depth.

### (vi) Steffen

Steffen testified regarding his criminal history. At the time of the parties' divorce, Steffen was involved in an incident for which he was initially charged with attempted murder. He testified that this charge "was dropped on [his] intake," and he was subsequently charged with two counts of terroristic threats. His testimony indicates that these charges were "dropped" and "expunged from [his] record" because "it was a self-defense case." His criminal history also includes convictions for traffic offenses such as driving under the influence of alcohol.

Regarding his move to Minnesota, Steffen testified that he could not afford his child support and alimony obligations under the November 2017 decree due to his level of income. He moved to Minnesota in June 2019 following a job offer he believed to be more lucrative than others available in Nebraska. Prior to trial, Steffen made employment and housing arrangements enabling his return to Nebraska, including accommodations for the parties' children, and he moved back to Nebraska in February 2021.

In addition to his concerns regarding the events on June 7 and 8, 2020, Steffen testified as to other concerns about the children following the parties' divorce. Steffen acknowledged that he had agreed for Victoria to homeschool their children while they were married, but he described that the children's homeschooling was initially more "regular" in that the children were being taught "at certain times" on a scheduled basis. Steffen testified that after their divorce, he felt the homeschooling "started to degrade" to the point that "[i]f [the children] didn't want to learn something, they didn't have to." Steffen also claimed that Victoria prevented him from being involved with the children's education while she had custody. He further testified of his preference for "traditional doctors [and] dentists" for the children over "home remedy" treatments, and he made medical, dental, and counseling appointments for the children following the temporary order granting him custody of the children.

Steffen testified that his relationships with the children have been positive despite the difficulties stemming from his work schedule and his subsequent move to Minnesota. He felt the children were improving after their time in counseling and their enrollment in public school and otherwise appeared more outgoing and "active than they have in the past."

### (vii) Victoria

Victoria testified regarding her homeschooling of the parties' children. She provided documentation received from the Nebraska Department of Education indicating that her requests to homeschool the children were approved over the years. She gathered educational materials based on her research, including books, magazines, and games to aid the children's education in reading, writing, math, and other subjects. She explained that she avoided "forced education" and instead tailored her homeschooling to the children's individual interests, facilitating the children's education in the directions indicated by their curiosity and desire to learn about particular subjects. The children also participated in activities with other children who were similarly homeschooled. She testified that the children's homeschooling has remained the same since the parties' divorce,

and she disagreed with the assessments of the children's socialization and education provided by the witnesses called by Steffen.

Regarding the children's medical needs, Victoria testified that she has taken the children to doctors on several occasions. She recalled that the children had "regular checkups" when they were "infants and toddlers," and she had also taken the children in to see medical professionals for injuries and evaluation for stomach and skin issues. Victoria affirmed that she "sometimes use[s] homeopathic healing or natural remedies" such as "essential oils" for some of the children's difficulties such as an "earache," allergies, "chapped lips," and skin issues. She believed these remedies have generally been "pretty successful" in treating the children's health problems.

Victoria characterized the incident on June 8, 2020, as the result of an "anxiety attack" stemming from multiple stressors, including financial difficulties, the COVID-19 pandemic, and civil unrest occurring in Omaha around that time. She testified that as part of her participation in the mental health diversion program for the charges resulting from the incident, she is "supervised weekly by a case manager" and "attend[s] therapy sessions . . . and anger management therapy weekly." She reported that she has not had a similar "anxiety attack" since the June 8 incident.

Victoria testified as to the positive relationships she has with her children, including during her supervised parenting time after the commencement of this action. While she noted that Osiris was a "little standoffish" during the first visit, her visits generally were positive for the children and herself. She felt that "there was a lot more separation between" her and the children after she retained an attorney, and it took more time for the children to "warm up" during the visits. Victoria also believed that Steffen and others had "interfered" with her relationships and visits with the children both prior to and during the pendency of this action.

### (d) Modification Order

The district court entered an "Order of Modification" on May 11, 2021. After a thorough summary of the evidence presented at trial, the court found that a material change in circumstances had occurred that warranted modification of the November 2017 decree. The court observed:

> Since [the entry of the November 2017 decree,] the evidence is clear that the children have been isolated, resulting in social anxiety. Further, [Victoria's] chosen method for home schooling has not provided the children with the educational progress that they will need to develop into thriving adults. [Her] claims that the children are receiving an education complementary to what they should or would receive in traditional school is not supported. [Victoria] was involved in a significant criminal incident on June 8, 2020, resulting in the children being removed from her care. She is currently involved in a mental health diversion program, yet provided no evidence of a professional diagnosis or treatment plan. She claims it was a one time "panic attack," however, there is no evidence to support her self-made diagnosis. She lacks insight and acceptance of any of the issues raised from the [guardian ad litem], Dr. Cottam, Ms. Quinn, or either grandmother. Rather she argues they are just making things up and coaching the children.

The court further noted that it considered and gave weight to the testimony of Osiris and Karma in its findings, concluding that the evidence did not indicate that their testimony was coached.

In evaluating the children's best interests, the district court awarded Steffen sole legal and physical custody of the children subject to Victoria's supervised parenting time as set forth in the parenting plan attached to the order. The parenting plan provided Victoria supervised parenting time "on alternate weekends, Friday, Saturday, and Sunday for three (3) hours on each day." The parenting plan further encouraged Victoria to participate in family therapy with the children provided by a separate therapist.

In addition to the modification of custody, the district court further modified the November 2017 decree's award of child support. The order required Victoria to pay $70 per month in child support to Steffen, retroactive to August 1, 2020. The court terminated Steffen's prior child support obligation under the November 2017 decree as of June 12, 2020, and Steffen's alimony obligation under the November 2017 decree remained in full force.

The district court entered a second order on May 11, 2021, concluding that Steffen was not in willful and contumacious contempt of court as to the allegations raised in Victoria's "Application for Contempt Citation." The court denied and dismissed the contempt application.

Victoria appeals.

### III. ASSIGNMENTS OF ERROR

Victoria, pro se, assigns 22 errors on appeal; however, many errors are vaguely expressed. A generalized and vague assignment of error that does not advise an appellate court of the issue submitted for decision will not be considered except to the extent that it is narrowed by the specific arguments asserted in the appellant's brief. *Finley-Swanson v. Swanson*, 20 Neb. App. 316, 823 N.W.2d 697 (2012). In a similar vein, many errors lack corresponding arguments in the body of Victoria's brief. In order to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. See *U.S. Pipeline v. Northern Natural Gas Co.*, 303 Neb. 444, 930 N.W.2d 460 (2019). These briefing requirements apply equally to represented litigants and pro se litigants. See *Friedman v. Friedman*, 290 Neb. 973, 863 N.W.2d 153 (2015) (pro se litigant will receive same consideration as if he or she had been represented by attorney, and concurrently, that litigant is held to same standards as one who is represented by counsel). Accordingly, we consider only those errors sufficiently assigned and argued by Victoria in her initial brief on appeal. Further, we note that Victoria's reply brief discusses issues not raised or argued in her initial brief. To the extent that Victoria raises additional errors and issues in her reply brief, we decline to address them. See *Linscott v. Shasteen*, 288 Neb. 276, 847 N.W.2d 283 (2014) (errors not assigned in appellant's initial brief are waived and may not be asserted for first time in reply brief).

Victoria assigns and argues, consolidated and restated, that the district court (1) lacked subject matter jurisdiction in this matter because Steffen had not resided with the parties' children in Nebraska for at least 6 months prior to his filing of the complaint for modification, (2) erred in appointing a guardian ad litem at a closed hearing without Victoria present, (3) erred in allowing the admission of certain witness testimonies and exhibits at trial, (4) should have recused itself due to misconduct and bias, (5) abused its discretion in finding that a material change in circumstances had occurred, and (6) abused its discretion in granting Steffen sole legal and physical custody of the parties' children subject to Victoria's supervised parenting time.

## IV. STANDARD OF REVIEW

A jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision. *Green v. Seiffert*, 304 Neb. 212, 933 N.W.2d 590 (2019).

In the absence of plain error, when an issue is raised for the first time in an appellate court, the issue will be disregarded inasmuch as a trial court cannot commit error regarding an issue never presented and submitted for disposition in the trial court. *Schnell v. Schnell*, 12 Neb. App. 321, 673 N.W.2d 578 (2003).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020). A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *Id.*

Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion by the trial court. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019).

## V. ANALYSIS

### 1. SUBJECT MATTER JURISDICTION

Victoria argues that "[b]efore [Steffen] can proceed, he has to be living with his children [for] at least 6 months prior to filing a [modification] claim in their home state." Brief for appellant at 26. We understand this assertion to contest the district court's subject matter jurisdiction to enter the order modifying the parties' decree.

Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved. *Boyd v. Cook*, 298 Neb. 819, 906 N.W.2d 31 (2018). Parties cannot confer subject matter jurisdiction upon a judicial tribunal by either acquiescence or consent, nor may subject matter jurisdiction be created by waiver, estoppel, consent, or conduct of the parties. *Id.* A lack of subject matter jurisdiction may be raised at any time by any party or by the court sua sponte. *Id.* A ruling made in the absence of subject matter jurisdiction is a nullity. *Spady v. Spady*, 284 Neb. 885, 824 N.W.2d 366 (2012).

In support of her argument, Victoria cites to Neb. Rev. Stat. § 43-1227(13) (Reissue 2016), which defines a "[p]erson acting as a parent" as:

[A] person other than a parent, who:

(A) has physical custody of the child or has had physical custody for a period of six consecutive months, including any temporary absence, within one year immediately before the commencement of a child custody proceeding; and

(B) has been awarded legal custody by a court or claims a right to legal custody under the law of this state.

- 11 -

Victoria appears to argue that because Steffen has not lived with the children for at least 6 months, he cannot be a "[p]erson other than a parent" and therefore could not have commenced this action. However, this statute is not applicable to this matter. Steffen is not a "[p]erson acting as a parent" for the parties' children, he is one of their parents; he is the children's father, just as Victoria is their mother.

Moreover, the district court's jurisdiction does not hinge on where Steffen resided in relation to the children. A district court has exclusive and continuing jurisdiction under the Uniform Child Custody and Jurisdiction Enforcement Act (UCCJEA) over custody and visitation issues if the court made the initial child custody determination. Neb. Rev. Stat. § 43-1239 (Reissue 2016). Exclusive and continuing jurisdiction remains with the district court under the UCCJEA until jurisdiction is lost under § 43-1239(a) or until the court declines to exercise jurisdiction under Neb. Rev. Stat. § 43-1244 (Reissue 2016) on the basis of being an inconvenient forum. *Floerchinger v. Floerchinger*, 24 Neb. App. 120, 883 N.W.2d 419 (2016). Jurisdiction is lost under § 43-1239(a) if neither the child nor the child and one parent have a significant connection with Nebraska and substantial evidence concerning custody is no longer available in the State, or if a court determines that the child and parents no longer reside in Nebraska. *Floerchinger v. Floerchinger, supra*.

The parties were married in Nebraska, and the Douglas County District Court entered the November 2017 decree dissolving the parties' marriage and establishing the parties' initial custody arrangement for their children. The children and Victoria have continued to reside in Nebraska since the entry of the November 2017 decree. Accordingly, the district court had jurisdiction to hear this modification action.

## 2. APPOINTMENT OF GUARDIAN AD LITEM

Victoria also appears to contest the district court's appointment of Wagner as guardian ad litem for the children. She claims that Wagner was appointed "[i]n a closed hearing . . . without legal reason to do so" because the children "were not in juvenile court jurisdiction." Brief for appellant at 26. However, the record does not evidence any objection to Wagner's appointment as guardian ad litem, and his appointment occurred through a stipulated order signed by Steffen's counsel and Victoria's first counsel. In the absence of plain error, when an issue is raised for the first time in an appellate court, the issue will be disregarded inasmuch as a trial court cannot commit error regarding an issue never presented and submitted for disposition in the trial court. *Schnell v. Schnell, supra*. Also, Neb. Rev. Stat. § 42-358 (Reissue 2016) provides for the appointment of a guardian ad litem in matters involving child custody. See *Matthews v. Matthews*, 267 Neb. 604, 676 N.W.2d 42 (2004). On our review of the record, we cannot say that the district court erred in appointing a guardian ad litem for the children in this case.

## 3. EVIDENTIARY ISSUES

Victoria alleges multiple violations of the Nebraska Rules of Evidence in this matter. Victoria's arguments concerning these issues are somewhat disjointed and nonspecific; we will identify those arguments sufficiently raised and proceed to address them in turn.

Victoria argues that several witnesses, including Dr. Cottam, Wagner, Mitchell, Quinn, and the children's paternal and maternal grandmothers, lacked personal knowledge regarding the

children's circumstances while in her custody, yet were allowed to testify in violation of Neb. Rev. Stat. § 27-602 (Reissue 2016) (witness may not testify to matter unless evidence is sufficient to support finding witness has personal knowledge of matter). However, no objections were made on this basis in response to the witnesses' testimonies. Having reviewed the record for plain error and finding none, we need not address these complaints further. See *Schnell v. Schnell, supra* (in absence of plain error, issue raised for first time in appellate court will be disregarded inasmuch as trial court cannot commit error regarding issue never presented and submitted for disposition in trial court). See, also, *State v. Senteney*, 307 Neb. 702, 950 N.W.2d 585 (2020) (appellate court is not inclined to readily find plain error in testimony to which opposing party did not object).

Victoria also claims that several lay witnesses gave testimony concerning medical or psychological matters which these witnesses were not qualified to provide. However, except for Smith-Clopton's testimony that she believed the children appeared "underweight" when she took them in after the June 2020 incident, Victoria did not object to these witnesses' testimonies at trial. Having reviewed the record for plain error and finding none, we need not address these allegations further. See, *State v. Senteney, supra*; *Schnell v. Schnell*, 12 Neb. App. 321, 673 N.W.2d 578 (2003). With respect to Smith-Clopton's testimony that she believed the children appeared underweight, the district court overruled the objection and determined that her testimony was admissible as a layperson's opinion. We agree with the district court's determination, as this opinion was premised on Smith-Clopton's personal observations of the children and life experience, and her opinion was therefore rationally based on her perception. See Neb. Rev. Stat. § 27-701 (Reissue 2016) (lay witness opinion testimony permitted when rationally based on perception of witness and helpful to determination of fact in issue). We conclude the district court did not abuse its discretion in allowing Smith-Clopton's testimony regarding this matter.

Victoria further alleges evidentiary error regarding the admission of exhibits of social media posts relating to Victoria's spirituality and corresponding cross-examination regarding these social media posts. She argues that the exhibits and related cross-examination were irrelevant and violated Neb. Rev. Stat. § 27-610 (Reissue 2016) as well as her constitutional rights. Section 27-610 states: "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature [his/her] credibility is impaired or enhanced." Victoria only raised objections concerning the relevance of the admitted exhibits, and the district court overruled these objections. We conclude that the district court did not abuse its discretion in overruling Victoria's relevance objections, as these exhibits were relevant to Victoria's character and patterns of behavior, and they did not impair or enhance her credibility. To the extent that Victoria alleges other errors regarding this evidence, we find no plain error by the district court. See, *State v. Senteney, supra*; *Schnell v. Schnell, supra*.

The remainder of Victoria's evidentiary allegations do not go to the actual admissibility of the testimony and exhibits received at trial. Rather, these allegations contest the weight and credibility assigned by the district court in its evaluation of the evidence presented at trial and therefore need not be addressed in further detail. See *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017) (when evidence is in conflict, appellate court considers, and may give weight to, fact that trial judge heard and observed witnesses and accepted one version of facts rather than another).

## 4. RECUSAL OF DISTRICT COURT JUDGE

Victoria asserts the district court should have recused itself due to its failure to act impartially in this matter. She claims the court "practiced law throughout" the trial, brief for appellant at 46, and otherwise acted "arbitrarily" in modifying the custody of the parties' children, *id.* at 45 (emphasis omitted). She also alleges the court impermissibly "allow[ed] hearsay" and accepted such hearsay as true despite the court's statements to the contrary. *Id.* (emphasis omitted). She claims the alleged instances of misconduct were all done impermissibly to benefit Steffen in this case and warranted the district court's recusal.

We first observe that Victoria never motioned for or otherwise requested the district court to recuse itself. To the extent that we evaluate this allegation for plain error, see *Schnell v. Schnell, supra*, the record does not support Victoria's allegations of judicial misconduct, bias, or partiality. We observe no instances of judicial misconduct concerning the district court's handling of the parties or of the evidence adduced at trial. That the court permitted examination that was unfavorable to Victoria and ultimately ruled unfavorably against her does not demonstrate bias or a failure to be impartial. Such issues go toward the weight and credibility to be assigned to the evidence presented, and an appellate court may give weight to the trial court that heard and observed the witnesses. See *Donald v. Donald, supra*.

## 5. MODIFICATION OF NOVEMBER 2017 DECREE

Prior to the modification of a child custody order, two steps of proof must be taken by the party seeking the modification. First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019). Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Id*.

### (a) Material Change in Circumstances

A material change in circumstances has been defined as the occurrence of something that, if it had been known at the time the most recent custody order was entered, would have persuaded the court to decree differently. See *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020). Due consideration of a variety of factors that bear on the best interests of the child, which may include the child's wishes, will determine whether finding a material change in circumstances is justified. See *id.*

Victoria argues that the evidence adduced at trial does not demonstrate that a material change in circumstances has occurred justifying the district court's modification. She specifically states that Steffen "testified and confirmed that nothing had changed" since the entry of the November 2017 decree, and she claims the finding of a material change in circumstances was premised entirely on the events occurring on June 8, 2020. Brief for appellant at 28.

On our review of the record, we find the district court did not abuse its discretion in finding that a material change of circumstances had occurred. In addition to the evidence concerning the events of June 8, 2020, there is evidence in the record regarding the children's circumstances prior to those events concerning their physical, mental, and educational well-being. Notably, Dr. Cottam testified about the symptoms of depression and anxiety exhibited by the children, especially Osiris

and Karma, and her work with the children indicated that these mental health issues stemmed in part from the children's circumstances while living with Victoria. Multiple witnesses, including Dr. Cottam, Mitchell, and Quinn, also testified regarding the children's level of education, and we note the recurrent indications that all of the children were, in some form, struggling with subjects such as math and reading. While Victoria argues that the evidence she presented at trial rebutted the evidence presented by Steffen, these arguments go toward the weight and credibility to be assigned to the parties' respective evidence. It is evident from the order of modification that the district court found the testimony and exhibits offered by Steffen to be credible and to constitute evidence that would have caused the dissolution court to have decreed differently during the parties' divorce. Given that this modification action substantially depended on the court's evaluation of the parties' respective witnesses and exhibits, we give weight to the district court that heard and observed the witnesses in this matter. See *Donald v. Donald*, *supra*. Accordingly, we find the district court did not abuse its discretion in finding a material change in circumstances.

(b) Best Interests

When deciding custody issues, the court's paramount concern is the child's best interests. *Lasu v. Lasu*, 28 Neb. App. 478, 944 N.W.2d 773 (2020). The foundation for the inquiry into the child's best interests lies in both statutory and case law. Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides that in determining custody and parenting time arrangements:

[T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

In addition to considering these statutory factors, our case law instructs that when making determinations as to the allocation of parenting time that is in a child's best interests, a trial court should also consider the parties' ability to communicate on issues such as transportation, homework, discipline, medical and dental appointments, and extracurricular activities. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). Other relevant considerations include stability in the child's routine, minimalization of contact and conflict between the parents, and the general nature and health of the individual child. *Id.* No single factor is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020).

Victoria argues that the evidence received at trial could not support a finding that Steffen having sole legal and physical custody of the children subject to Victoria's supervised parenting time was in the children's best interests. Victoria asserts that a preponderance of the evidence must

demonstrate "multiple occurrences of child abuse or neglect" before a parent may lose custody and be limited to supervised parenting time. Brief for appellant at 29. Victoria's argument on this matter appears to rely on Neb. Rev. Stat. § 43-2932 (Reissue 2016), which requires the district court to incorporate limitations on custody and parenting time if a preponderance of the evidence demonstrates that a parent has "committed child abuse or neglect," "child abandonment," "domestic intimate partner abuse," or otherwise "interfered persistently with the other parent's access to the child." This statute imposes an affirmative obligation on the district court to limit custody and parenting time in light of evidence of such conduct; it does not, as Victoria argues, preclude the court from changing custody of a child from one parent to the other in the absence of such conduct. Changing custody falls within the modification court's discretion, and the relevant inquiry is whether changing custody to the noncustodial parent would be in the child's best interests. See *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021).

In considering the children's best interests, we bear in mind again the same testimony set forth previously concerning the children's health and education as testified to by Dr. Cottam, Mitchell, and Quinn, as well as the testimony provided by the parties, their extended family, and the children. Those same concerns regarding the children's physical and mental health while in Victoria's custody, including their education, are also applicable to the question of the children's best interests. These witnesses did not raise similar concerns toward Steffen, and we observe the substantial evidence regarding Steffen's arrangements to have the children see various professionals concerning their education and health. Victoria primarily alleges that the witnesses who testified favorably toward Steffen were lying or otherwise engaged in bad faith assessments of the circumstances. However, these issues go toward the weight and credibility of the witnesses, and it is evident from the district court's order that it found changing custody in this case to be in the children's best interests and concluded the evidence favorable to Steffen to be more credible. Having reviewed the record, we give weight to the district court's evaluation of the evidence presented in this case. See *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017). Although the evidence presented by the parties is in conflict, we cannot say the district court abused its discretion in awarding Steffen sole legal and physical custody of the parties' children subject to Victoria's supervised parenting time.

## VI. CONCLUSION

For the reasons set forth above, we affirm the order of modification entered by the district court in all respects.

AFFIRMED.